Rosezola **SELLERS**, Plaintiff,

v.

**UNITED STATES DEPARTMENT OF DEFENSE and Robert M. Gates, Secretary of the Department of Defense, Defendants.**

C.A. No. 05–381 S.

United States District Court,
D. Rhode Island.

July 16, 2009.

Louise A. Herman, Patricia E. Andrews, Providence, RI, for Plaintiff.

Ly T. Chin, U.S. Attorney's Office, Providence, RI, for Defendants.

### MEMORANDUM AND ORDER

WILLIAM E. SMITH, District Judge.

Before the Court is Plaintiff's Appeal of Magistrate Judge Martin's January 23, 2009 Report and Recommendation ("R & R") urging this Court to grant Defendants' Motion for Summary Judgment. Plaintiff objects only to the Magistrate Judge's conclusions regarding the narrow issue of comparative evidence. For the reasons set forth below, Plaintiff's objection is denied and the R & R is adopted in full.

### I. Standards of Review

In considering Plaintiff's objection, this Court must conduct "a de novo determination of those portions of the [R & R] to which objection is made" and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); see also Fed.R.Civ.P. 72(b)(3); Hartford Ins. Co. v. Gen. Elec. Co., 526 F.Supp.2d 250, 251 (D.R.I.2007).

Summary judgment is appropriate only if, viewing all factual disputes in the light most favorable to the nonmoving party, there is no genuine issue of material fact that would prevent judgment for the moving party as a matter of law. Meuser v. Federal Express Corp., 564 F.3d 507, 515 (1st Cir.2009); see also Fed.R.Civ.P. 56(c). "Genuine issues of material fact are not the stuff of an opposing party's dreams. On issues where the nonmovant bears the ultimate burden of proof, he must present definite, competent evidence to rebut the motion." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir.1991); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Although the Plaintiff in this case has the benefit of all reasonable inferences, judgment as a matter of law for the Defendants is appropriate "[e]ven in employment discrimination cases where elusive concepts such as motive or intent are at issue ... if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir.2000) (quoting Medina–Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir.1990) (internal quotation marks omitted)); see Bonilla v. Electrolizing, Inc., 607 F.Supp.2d 307, 314 (D.R.I. 2009).

### II. Facts & Travel

Magistrate Judge Martin's R & R contains a detailed and thorough recitation of the facts, which need not be repeated here. The Court briefly relates those facts relevant to this appeal.[1]

Plaintiff, an African American woman, began working at the Newport Naval Commissary in Newport, Rhode Island in 1988 and was promoted to store worker in 1997. Her direct supervisor was grocery manager Mary Gibson ("Gibson"). In the Commissary's managerial hierarchy, Gibson reported to store administrator Steven J. Furtado ("Furtado"), and he in turn reported to store director John T. Blythe ("Blythe"). In 2003, Furtado and Blythe promoted Plaintiff to Commissary Management Specialist trainee.

On December 5, 2003, Plaintiff was stocking shelves when Gibson instructed her to go to the "chill" area to stock. The

1. See R & R at Section II for additional facts and background.

"chill" area held boxes of cold products such as cheese, butter, milk, and eggs. Plaintiff refused, claiming both an injury to her hand and a lack of appropriate clothing, although Gibson informed her that jackets were available for that purpose. After consulting with Blythe about the incident, Gibson indicated to Plaintiff that there was nothing in her personnel file documenting any current restrictions and again directed her to stock the "chill" area. Plaintiff loudly refused this second instruction; Gibson subsequently stocked the chill area herself. On February 25, 2004, Gibson issued a letter of reprimand to Plaintiff for failure to follow instructions and disrespectful conduct.

In April 2004, Plaintiff filed an EEO complaint alleging several incidents of racial discrimination, including Gibson's letter of reprimand. The agency found no discrimination or retaliation.[2] On September 2, 2005, Plaintiff filed her complaint with this Court, and on January 31, 2008, Defendants' Motion for Summary Judgment was referred to Magistrate Judge Martin for preliminary review, findings, and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Magistrate Judge Martin granted the motion in Defendants' favor on each of Plaintiff's claims of disparate treatment, hostile work environment and retaliation. (See R & R at 110–12.) On March 9, 2009, Plaintiff filed a limited objection to the R & R, claiming the Magistrate Judge erred in his consideration of the comparative evidence she offered regarding the letter of reprimand to establish discrimination based on race.

III. *Discussion*

In opposing summary judgment, Plaintiff relied on a cavalcade of comparative evidence allegedly demonstrating that Gibson, Furtado, and Blythe disciplined similarly situated white employees that engaged in more egregious misconduct less severely than Plaintiff or not at all. (Pl.'s Mem. 17–30.) Since the only remaining discipline issue before Magistrate Judge Martin was Gibson's letter of reprimand to Plaintiff, he concluded that incidents which did not involve the imposition or withholding of discipline by Gibson were not comparable. (R & R at 97–98.) The Magistrate Judge reasoned that employees disciplined by different supervisors were not similarly situated in all material respects, absent evidence of a company-wide discipline policy or coordination. (R & R at 97–98.) In short, he found Plaintiff was comparing apples to oranges in an unsuccessful attempt to conjure up a speck of pretext behind Gibson's letter.

Citing a laundry list of cases, Plaintiff argues in her objection that this conclusion is erroneous because "the law makes clear that employees do not have to report to the same supervisor in order to be similarly situated." (Pl.'s Obj. 2.) Plaintiff also raises a new argument in her objection that she offered evidence demonstrating that Gibson could not have disciplined Plaintiff without consultation, input, and approval from Furtado and Blythe; thus, she contends, the purported comparators were indeed similarly situated.[3] In re-

---

2. Plaintiff's claim that she was terminated as a result of unlawful discrimination and retaliation is part of a separate action now pending before this Court. *See* (Opinion and Order (Doc. # 45) (denying appeal of Magistrate Judge's Memorandum and Order denying Plaintiff's motions to Amend and Compel (Doc. # 28))); *See also Sellers v. United States Dep't of Defense*, CA 07–418S, Comp. ¶ 14.

3. Plaintiff acknowledges she did not advance this "Gibson did not act alone" argument to the Magistrate Judge with respect to the issuance of the letter of reprimand; (Hr'g Tr. 3:14–20, May 12, 2009); and therefore the

sponse, Defendants urge this Court to adopt the R & R in its entirety. They contend the Magistrate Judge's findings on comparative evidence are consistent with the decisions of numerous courts, and that in any event the additional alleged comparators are not similarly situated to Plaintiff. (Def.'s Resp. 2.)

Based on its *de novo* review, this Court concludes that Magistrate Judge Martin correctly found that the comparative evidence Plaintiff offered involving different supervisors was not comparable. *See Rodriguez–Cuervos v. Wal–Mart Stores, Inc.,* 181 F.3d 15, 21 (1st Cir.1999); *Dartmouth Review v. Dartmouth Coll.,* 889 F.2d 13, 19 (1st Cir.1989), *overruled on other grounds by Educadores Puertorriquenos en Accion v. Hernandez,* 367 F.3d 61, 64 (1st Cir. 2004). Furthermore, assuming for purposes of argument that the Magistrate Judge erred, Defendants are nonetheless entitled to summary judgment because even with these so-called additional comparators, Plaintiff lacks sufficient evidence of pretext with respect to race to overcome the undisputed, legitimate disciplinary rationale behind Gibson's letter of reprimand. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Shorette v. Rite Aid of Maine, Inc.,* 155 F.3d 8, 13 (1st Cir.1998).

▮ It is fundamental that "[a] claim of disparate treatment based on comparative evidence must rest on proof that the proposed analogue is similarly situated in all material respects." *Rodriguez–Cuervos,* 181 F.3d at 21 (quoting *Perkins v. Brigham & Women's Hosp.,* 78 F.3d 747, 751 (1st Cir.1996)). Plaintiff must demonstrate that the circumstances of the incidents involving Furtado, Blythe, and the

other Commissary employees were reasonably comparable to those surrounding the letter of reprimand Gibson issued to Plaintiff. *See Dartmouth,* 889 F.2d at 19. The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. *Id.* The comparators need not be exact replicas, but should be "fair congeners ... [i]n other words, apples should be compared to apples." *Id.* at 21.

▮ While there is no exhaustive list of relevant factors, in general terms a plaintiff must show purported comparators "have dealt with the same supervisor, been subject to the same standards and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or [their employers'] treatment of them for it." *Walker v. Ohio Dep't of Rehab. & Corr.,* 241 Fed.Appx. 261, 266 (6th Cir. 2007) (internal citation and quotation omitted); *see also Rodriguez–Cuervos,* 181 F.3d at 21 (adopting nearly identical language and citing *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir.1992)). Employees are generally not similarly situated if they are subject to the decisions of different supervisors. *See, e.g., Fields v. Shelter Mut. Ins. Co.,* 520 F.3d 859, 864 (8th Cir.2008) ("[W]hen different decisionmakers are involved, two decisions are rarely similarly situated in all relevant aspects.") (quoting *Stanback v. Best Diversified Prods., Inc.,* 180 F.3d 903, 910 (8th Cir.1999)); *Radue v. Kimberly–Clark Corp.,* 219 F.3d 612, 618 (7th Cir.2000) ("[D]ifferent employment decisions, concerning different employees, made by dif-

argument is waived. *See Paterson–Leitch Co. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990–91 (1st Cir.1988); *Borden v. Sec'y of*

*Health & Human Servs.,* 836 F.2d 4, 6 (1st Cir.1987); *Fireman's Ins. Co. v. Todesca Equip. Co.,* 310 F.3d 32, 38 (1st Cir.2002).

ferent supervisors, are seldom sufficiently comparable.").

In *Rodriguez–Cuervos,* the First Circuit affirmed summary judgment for the defendant where evaluations completed by different supervisors, at different times, and in different stores did not yield evidence of discrimination. 181 F.3d at 21. This holding echos the sound reasoning that "[d]ifferent supervisors will inevitably react differently to employee insubordination." *Metzler v. Federal Home Loan Bank of Topeka,* 464 F.3d 1164, 1175 (10th Cir. 2006) (internal citation and quotation omitted). Here, Plaintiff seeks to compare Gibson's letter of reprimand to a hodge-podge of different disciplinary actions meted out by different supervisors at different times. Thus, as in *Rodriguez–Cuervos,* the Magistrate Judge properly concluded that employees disciplined by Furtado and Blythe were not comparable. *See* 181 F.3d at 21; *see also Franklin v. City of Evanston,* 384 F.3d 838, 847–48 (7th Cir. 2004) (affirming summary judgment for defendant where alleged comparator was disciplined by different supervisor who determined the level of discipline).

Plaintiff is correct that the existence of different supervisors is not *per se* dispositive in a comparative evidence/pretext analysis. But the facts here are distinguishable from cases where courts have found comparable evidence involving different supervisors. *See Petsch–Schmid v. Boston Edison Co.,* 914 F.Supp. 697 (D.Mass.1996); *Bratton v. CSX Transp., Inc.,* 586 F.Supp.2d 12 (D.Mass.2008). For example, the Court in *Petsch–Schmid* rejected the necessity of the "same supervisor" criterion where the defendant introduced evidence of company-wide policies intended to provide guidance to all supervisors. *See* 914 F.Supp. at 705 n. 17. Here, Plaintiff adduced no evidence of such policies before the Magistrate Judge,

and unsupported speculation or allegation that supervisors at the Commissary somehow acted in concert is plainly insufficient to survive summary judgment. *See Bratton,* 586 F.Supp.2d at 20 (rejecting application of the same supervisor criterion only where disciplinary actions reflected company-wide policies and the specific supervisor was not particularly relevant to the inquiry). In sum, Plaintiff offers no basis on which the Court could, in essence, ignore or overlook the fact that the additional incidents to which Plaintiff points involve Furtado and Blythe but not Gibson.

Supposing, nevertheless, that the Magistrate Judge erred in his consideration—or lack thereof—of Plaintiff's "non-Gibson" comparative evidence, Defendants are still entitled to summary judgment on Plaintiff's disparate treatment claim. The letter of reprimand was issued for failure to follow instructions and disrespectful conduct. (Def.'s App., Ex. 1b at D–0194.) There is no question this is a legitimate and non-discriminatory rationale. Therefore, the burden shifts to Plaintiff to show that Gibson's stated reason was pretextual. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. Plaintiff must prove not only that Gibson's articulated reason was a sham, but also that her true reason was fueled by Plaintiff's race. *See Rodriguez–Cuervos,* 181 F.3d at 19 (citing *Shorette,* 155 F.3d at 13).

Plaintiff admits she refused to comply with Gibson's request that she stock the chill area, and it is undisputed that there was at least one jacket available for that purpose. (Def.'s SUF ¶ 55; R & R at 103–04.) Additionally, the evidence indicates Gibson honestly believed Plaintiff was under no medical restrictions based upon the information in her personnel file. (Def.'s SUF ¶ 67; Gibson Dep. 74:24–75:3, July 25, 2007.) This belief is bolstered by the fact that Plaintiff was stocking another

part of the store at the time the request was made. (Def.'s SUF ¶ 64.) Plaintiff provided no documentation showing otherwise. (Gibson Decl. ¶ 8, Nov. 30, 2007.) The only shred of evidence suggesting a pretextual purpose and discriminatory animus is a list of white employees who allegedly engaged in more egregious conduct than Plaintiff and received different discipline. (Pl.'s Mem. 17–30.)

The circumstances of the other employees Gibson disciplined differ materially from the circumstances of the letter of reprimand, and therefore cannot function as comparable comparators. *See Rodriguez–Cuervos,* 181 F.3d at 21. In particular, Gibson's incident with McCollum was based on hearsay, rather than direct interaction; Texeira's appeals to Furtado to escape work from Gibson did not involve disrespectful defiance of a supervisor's request; refusals to provide written statements and a letter of reprimand are too dissimilar for reasonable comparison. (R & R at 98–101.) "Human relationships are inherently complex. Large employers must deal with a multitude of employment decisions, involving different employees, different supervisors, different time periods, and an incredible array of facts that will inevitably differ among seemingly similar situations." *Kendrick v. Penske Transp. Servs., Inc.,* 220 F.3d 1220, 1232 (10th Cir.2000) (quoting *E.E.O.C. v. Flasher Co.,* 986 F.2d 1312, 1319 (10th Cir. 1992)). The bald assertion that other employees refused to perform tasks when directed (Pl.'s Mem. 20) or engaged in other misconduct is insufficient to make them valid comparators in this case. *See Dartmouth,* 889 F.2d at 19.

Furthermore, even when the "non-Gibson" comparators are added to the mix, the incidents involving supervisors Furtado and Blythe do little to shore up Plaintiff's pretext argument. Blythe did not consider McCollum disrespectful, nor did the incident involve a refusal to perform particular duties, but rather a strong expression of opinion. (Pl.'s Resp. 19; Def.'s App. 15; Furtado Dep. 87:23–88:7). Similarly, Venable's cursing in front of the supervisors and Blythe's failure to discipline her for being "absent without leave" are not reasonably comparable to the circumstances of the chill incident. *See Ney v. City of Hoisington,* 264 Fed.Appx. 678, 683 (10th Cir.2008) (finding refusal to meet with supervisors was not similar to cursing); *Kendrick,* 220 F.3d at 1232 (holding verbal abuse alone was not comparable to plaintiff's cursing combined with other conduct). Even if the alleged disruptive, disrespectful argument between Blythe and Venable was similar to Plaintiff's encounter with Gibson, the single incident falls woefully short of establishing competent evidence of racially motivated pretext to rebut Defendants' motion. *See Mesnick,* 950 F.2d at 822. Thus, even if the Magistrate Judge's consideration of Plaintiff's comparative evidence was erroneous, his ultimate recommendation was correct.

IV. *Conclusion*

For the reasons discussed above, Plaintiff's objection is DENIED, and the Report and Recommendation issued on January 29, 2009 in the above-captioned matter is accepted in full pursuant to 28 U.S.C. 636(b)(1).

It is so ordered.

ROSEZOLA SELLERS, Plaintiff,

v.

UNITED STATES DEPARTMENT OF DEFENSE AND SECRETARY OF OF THE DEPARTMENT OF DEFENSE, ROBERT M. GATES,[1] Defendants.

---

1. Pursuant to Fed.R.Civ.P. 25(d), Robert M.

Gates has been substituted for Donald Rums-

## REPORT AND RECOMMENDATION

DAVID L. MARTIN, United States Magistrate Judge.

Before the Court is Defendants' Motion for Summary Judgment (Doc. # 32) ("Motion for Summary Judgment" or "Motion"). The Motion has been referred to me for preliminary review, findings, and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B). After reviewing the filings, listening to oral argument, and performing independent research, I recommend that the Motion be granted for the reasons stated below.

### Index

I. Overview .................................................................71

II. Facts ...................................................................72
 A. Actors ..............................................................72
 B. Promotion to CAO ..................................................72
 C. Annual Leave Requests .............................................73
 D. Request for Restoration of Leave ..................................75
 E. Letter of Reprimand ...............................................76
 F. Change in Schedule ................................................79
 G. Fourteen Day Suspension ...........................................80
 H. Administrative EEO Complaints .....................................81
 1. First EEO Complaint ............................................81
 2. Second EEO Complaint (Subject of this Case) ....................81

III. Travel .................................................................82

IV. Summary Judgment Standard ..............................................83

V. Defendants' Objection to "Surreply" .....................................84

VI. Claims against Dep't of Defense ........................................85

VII. Count I—Disparate Treatment ...........................................86
 A. Employment Discrimination Law .....................................86
 B. Administrative Exhaustion .........................................87
 1. Annual Leave Requests ..........................................87
 2. Promotions and Pay .............................................89
 3. Fourteen Day Suspension ........................................90
 C. Prima Facie Case ..................................................91
 1. Less Favorable Treatment .......................................92
 a. Annual Leave Requests .......................................92
 b. Restoration of Leave ........................................93
 c. Change in Work Schedule .....................................93
 2. Adverse Action .................................................94
 a. Denial of Annual Leave Requests .............................94
 b. Change in Schedule ..........................................96
 3. Summary Re Prima Facie Case ....................................96
 D. Non–discriminatory Reasons ........................................97
 E. Pretext ...........................................................97
 1. Comparative Evidence ...........................................97

feld as a Defendant in this action. *See* Fed. R.Civ.P. 25(d)(1) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party. Later proceedings should be in the substituted party's name....").

| | | a. | William McCollum | 98 |
| | | b. | Mike Texeira | 99 |
| | | c. | Ryan Diego | 100 |
| | | d. | Richard Walsh | 101 |
| | | e. | Charles Cloud and Thelma Edens | 101 |
| | 2. | Pretext Analysis Re Specific Claims | | 101 |
| | | a. | Denial of Annual Leave Requests | 101 |
| | | b. | Denial of Restoration of Leave | 102 |
| | | c. | Letter of Reprimand | 103 |
| | | d. | Promotion and Change in Schedule | 103 |

VIII. Count II—Hostile Work Environment ... 106
 A. Law ... 106
 B. Application ... 106

IX. Count III—Retaliation ... 108
 A. Law ... 108
 B. Application ... 109
 1. Adverse Employment Action ... 109
 2. Causal Connection ... 109
 a. Temporal Proximity ... 109
 b. Gibson's Lack of Knowledge ... 110

X. Summary ... 110
 A. Count I—Disparate Treatment ... 110
 B. Count II—Hostile Work Environment ... 111
 C. Count III—Retaliation ... 111

XI. Conclusion ... 111

## I. Overview

Plaintiff Rosezola Sellers ("Plaintiff" or "Sellers"), who is black, formerly worked at the Navy commissary in Newport, Rhode Island. *See* Defendants' Corrected Statement of Facts as to Which There Is No Genuine Dispute (Doc. # 37) ("Statement of Undisputed Facts" or "SUF") ¶¶ 1, 6. The commissary is operated by the Defense Commissary Agency ("DeCA"), an independent agency within the United States Department of Defense ("Department of Defense"). *See id.* ¶ 2. Plaintiff alleges that while employed at the commissary she was subjected to disparate treat-

ment (Count I) and a hostile work environment (Count II) because of her race and that, after complaining about this discrimination and harassment, she was subjected to retaliation (Count III). *See* First Amended Complaint (Doc. # 2) ("Amended Complaint") ¶¶ 10, 12, 17–25. Plaintiff avers that the disparate treatment and harassment are evidenced by the different treatment she received with respect to promotions, pay, time off, work hours, and work assignments compared to similarly situated white employees.[2] *See id.* ¶ 11. She claims that the retaliation included

---

**2.** While not specifically alleged in her First Amended Complaint ("Amended Complaint"), Plaintiff also argues that the she was subjected to disparate treatment and a hostile work environment with respect to discipline. *See, e.g.,* Plaintiff's Memorandum in Support of Her Objection to Defendants' Corrected Memorandum in Support of Their Motion for Sum-

mary Judgment ("Plaintiff's Mem.") at 12 (disputing that Plaintiff is unable to establish a prima facie case of discrimination with respect to, among other claims, the letter of reprimand of February 25, 2004); *id.* at 39 (asserting in support of her hostile work environment claim that she was "unjustifiably disciplined and suspended for two weeks").

disciplining her for no legitimate reason.[3] *See id.* ¶ 13. The Department of Defense and the Secretary of the Department of Defense ("Defendants") deny these allegations, *see* Answer (Doc. # 4), and by the instant Motion seek summary judgment, *see* Motion.

## II. Facts

### A. Actors

Plaintiff began working as a laborer at the Newport commissary in 1988. SUF ¶ 6. Sometime thereafter she went to work at the commissary in New London, Connecticut. SUF ¶ 8. In 1993, she was reassigned to the Newport commissary. SUF ¶ 9. John T. Blythe, Sr. ("Blythe"), became store director of the Newport commissary in 1994. SUF ¶ 10. Plaintiff was promoted to store worker in 1997. SUF ¶ 11. Three years later, Steven J. Furtado[4] ("Furtado") became store administrator, the position immediately below store director. *Id.*; *see also* Appendix of Exhibits and Exhibits in Support of Defendants' Motion for Summary Judgment ("Defen-

dants' App."), Ex. 1b at D–0161 (Organizational Chart). In August of 2003, Mary Gibson ("Gibson") became the grocery manager. SUF ¶ 35. In the store hierarchy, Gibson reported to Furtado and Furtado reported to Blythe.[5] *See* Defendants' App., Ex. 1b at D–0161. Thus, Gibson was Plaintiff's supervisor, Furtado was Plaintiff's second-level supervisor, and Blythe was Plaintiff's third-level supervisor. *See id.*; *see also* SUF ¶ 4.

### B. Promotion to CAO

In 2003 Plaintiff applied for and was selected over two other applicants for the position of Commissary Management Specialist trainee. SUF ¶ 12. This position is commonly referred to as "CAO," apparently because its full title is "Commissary Management Specialist in charge of Computer Assisted Ordering." Defendants' App., Ex. 1d at 26 (identifying position by this title). Both Blythe and Furtado believed that Plaintiff was the best candidate for the job at the time.[6] SUF ¶ 13. Plain-

---

3. Although Plaintiff contends that her termination in December 2005 was also due to unlawful discrimination and retaliation, that claim is not part of the instant action. *See* Opinion and Order (Doc. # 45) (denying appeal of this Magistrate Judge's Memorandum and Order Denying Plaintiff's Motions to Amend and to Compel (Doc. # 28)); *see also* *Sellers v. United States Dep't of Defense, et al.*, CA 07–418 S, Complaint (Doc. # 1) ¶ 14 (alleging that Plaintiff's removal from federal service was due to racial discrimination and/or unlawful retaliation).

4. Mr. Furtado's first name is spelled in the record as both "Stephen," Appendix of Exhibits and Exhibits in Support of Defendants' App."), Ex. 4 (Furtado Declaration ("Decl.")) and "Steven," *id.*, Ex. 4e (Memorandum for Record). Based on his signature, the Court uses the latter spelling.

5. An organizational chart for the Newport commissary shows Blythe at the top, Furtado

directly beneath him, and Gibson as one of four managers beneath Furtado. *See* Defendants' Ex. 1b at D–0161 (Organizational Chart).

6. Plaintiff denies this fact, *see* Plaintiff's Statement of Disputed Facts ("PSDF") ¶ 13, but the portion of the record which Plaintiff cites fails to support her denial, *see id.*; *see also* Sellers Dep. at 91–92. To the extent that Plaintiff may contend that her denial is supported by other "facts set forth in her memorandum in opposition to her [sic] motion for summary judgment," PSDF at 1 n. 1, the Court rejects this attempt to circumvent the requirements of the Local Rules. Local Rule Cv 56(a)(3) requires a party contesting the movant's SUF to "identify the evidence establishing the dispute in accordance with the requirements of paragraph (a)(2)," DRI LR Cv 56(a)(3), and those requirements mandate reasonable specificity, *see* DRI LR Cv 56(a)(2). A general reference to Plaintiff's 39 page memorandum does not meet this standard.

tiff was chosen over Mary Bucolo ("Bucolo"), a white employee.[7] SUF ¶ 14. At the time Plaintiff was selected for the CAO position, Blythe was aware that Plaintiff had previously engaged in Equal Employment Opportunity ("EEO") activity as he had been contacted a few years earlier by an EEO representative with reference to Plaintiff. SUF ¶ 15. Plaintiff's promotion to CAO became effective on September 9, 2003. SUF ¶ 16.

## C. Annual Leave Requests

On July 11, 2003, Plaintiff submitted three applications for leave. SUF ¶ 18. The first application sought annual leave for August 7 and 8, 2003; the second for August 28 and 29, 2003; and the third for August 31, 2003. SUF ¶¶ 19–21. On July 13, 2003, Furtado advised Plaintiff that she needed to submit a leave planner which was required by the Master Labor Agreement ("MLA").[8] SUF ¶ 22. Prior to 2003, Plaintiff had submitted a leave planner every year in her fourteen year career. *See* Sellers Deposition ("Dep.") at 26.

On July 14, 2003, Blythe wrote a note to Plaintiff that stated:

> I am still waiting for your required leave planner. I will not approve any leave requests until the planner is submitted. All employees are required to do this.

Defendants' App., Ex. 1b at D–0185. That same day Blythe denied Plaintiff's leave applications because she had not submitted a leave planner.[9] *See* SUF ¶ 27; *see also*

---

7. Plaintiff denies this fact, *see* PSDF ¶ 14, but provides no citation to evidence in the record which supports her denial, *see* n. 5 It is therefore deemed admitted. *See Carrasquillo v. Puerto Rico, through Its Justice Dep't,* 494 F.3d 1, 4 (1st Cir.2007)("[N]oncompliance with [Local Rule 56(c)], as manifested by a failure to present a statement of disputed facts, embroidered with specific citations to the record, justifies the court's deeming the facts presented in the movant's statement of undisputed facts admitted and ruling accordingly.")(alterations in original).

8. Plaintiff denies that the leave planner was a requirement of the Master Labor Agreement ("MLA"). *See* PSDF ¶ 22. However, the evidence which Plaintiff cites to support her denial only establishes that an employee who did not submit a leave planner could still take time off if it did not result in the store being short-handed. *See id.; see also* Furtado Deposition ("Dep.") at 116. This does not contradict the fact that the leave planner was a requirement of the MLA. *See* Defendants' App., Ex. 4 (Furtado Decl.) ¶¶ 5–6; *see also id.,* Ex. 15(MLA) at 30 ("Employees will submit their annual leave plan on DeCA Form 30–14 by 1 February of each year to identify employees' annual leave desires and to resolve conflicts among employees' annual leave plans.").

9. Plaintiff denies this fact. *See* PSDF ¶ 27. However, the only evidence she cites with the specificity required by LR Cv. 56(a) to support the denial is Blythe's deposition testimony at "269–70." PSDF ¶ 27. Blythe testified in 2007, four years after the fact, that he had denied Plaintiff's leave requests (without reference to any particular requests) "[b]ecause the other employees had already put in for those days, and she wouldn't submit a leave plan so that we could determine her days." Blythe Dep. at 270. The documentary evidence, created contemporaneously, reflects that the three applications for leave in August 2003 were all denied on July 14, 2003, and a notation made on one of them states: "No leave planner submitted." Defendants' App., Ex. 1b at D–0189 (Three Applications for Leave). Plaintiff subsequently submitted two applications for leave in November 2003 which were denied with the notation "Already people on leave this week[.]" *Id.,* Ex. 1b at D–0190 (Two Applications for Leave). The Court is unpersuaded that the deposition testimony which Plaintiff cites supports her denial of SUF ¶ 27.

It also bears noting with respect to the reason the three requests for leave were denied on July 14, 2003, that Furtado had written a memorandum the previous day stating:

> On July 13, 2003, I advised Rose Sellers that she needed to put in a leave planner as requested by all employees. She stated that she had no intentions of doing so. She stated that she does not know what dates

Defendant's App., Ex. 1b at D–0189 (Three Applications for Leave); Blythe Dep. at 270.

On July 15, 2003, Furtado directed Plaintiff to submit her annual leave planner by July 23, 2003. SUF ¶ 29. A similar directive was conveyed by Blythe two days later in a written memorandum addressed to Plaintiff and four other employees. *See* Defendants' App., Ex. 1b at D–0187 (Memorandum from Blythe to Sellers, et al., of 7/17/2003). The memorandum stated:

> At a meeting I held with all department managers in January, I discussed the requirement for all employees to submit an annual leave planner. If you are receiving this memorandum, I have either not received one or the leave you have annotated on the planner does not equal your use or lose balance. I cannot over emphasize the importance of you submitting the planner as instructed. Failure to comply could result in disapproval of your request and forfeit of any unused balances at the end of the leave year. Please note no leave will be granted the week of Thanksgiving, Christmas and New Years.
>
> Deadline for submission is July 22, 2003. *Id.*[10]

Subsequent to the issuance of this instruction, the other four employees submitted leave planners, but Plaintiff did not. *See* Blythe Dep. at 270. On July 22, 2003, she wrote a handwritten response on the bottom of the memorandum which stated:

> Leave planners was [sic] given out in *June*, not *January*. Sense [sic] I am held strictly to what I put down—I'm not sure of my dates. I don't want what happened last year to happen again.

Defendants' App., Ex. 1b at D–0187. Plaintiff was the only employee at the Newport commissary who did not submit a leave planner for 2003. SUF ¶ 33.

On October 15, 2003, Plaintiff submitted a request for annual leave during the period October 22–24, 2003. SUF ¶¶ 36–37. Although she had not submitted a leave planner listing these dates, Plaintiff's leave request was approved by Furtado on October 20, 2003. SUF ¶ 38.

On November 3, 2003, Plaintiff submitted two applications for leave. SUF ¶ 39. The first application sought annual leave for November 14–15, 2003, and the second sought annual leave for November 18–22, 2003. SUF ¶¶ 40–41. Furtado denied the applications for leave on the dates Plaintiff requested, SUF ¶ 42, because there were already people on leave during these weeks, SUF ¶ 43.[11] William McCollum ("McCollum"), the other CAO, was not

---

that she wanted to take from now till the end of the year.
Defendants' App., Ex. 4b (Furtado 7/13/03 Memorandum for Record).

10. Despite these written communications from Blythe and Furtado regarding the importance of submitting a leave planner, Plaintiff testified at her deposition that she "didn't know it was that big of a deal." Sellers Dep. at 31.

11. Plaintiff denies SUF ¶ 43, *see* PSDF ¶ 43, but the evidence she cites either does not dispute SUF ¶ 43, *see* PSDF ¶ 43 (citing "Exhibit 17. Furtado Deposition at 115 ..."), or its location in the record is not stated with

sufficient specificity to enable the Court to find it without searching through the voluminous exhibits, *see* PSDF ¶ 43 (citing "Affidavits of Bythe and Furtado in response to 2004 Charge").

To the extent that Plaintiff may have intended to cite to Plaintiff's Exhibit ("Plaintiff's Ex.") 16 instead of Plaintiff's Ex. 17, it appears from Ex. 16 that other employees took leave during all or part of both periods of leave identified in the applications Plaintiff submitted on November 3, 2003. *See* Plaintiff's Ex. 16 at 129–31, 133–35. Thus, Plaintiff's Ex. 16 also does not support the denial.

scheduled to work on November 15, 2003, and November 22, 2003.[12] SUF ¶ 44. McCollum also had scheduled and eventually took annual leave on November 18, 2003.[13] SUF ¶ 45.

On November 25, 2003, Plaintiff submitted an application for forty hours of sick leave for the dates of November 18–22, 2003. SUF ¶ 46. Furtado approved Plaintiff's leave request the same day. SUF ¶ 47.

Although Plaintiff was denied leave for certain dates in 2003, there were many occasions on which she was approved both annual and sick leave for 2003, even though she failed to include these dates on a leave planner. SUF ¶ 48. An audit of Plaintiff's leave in 2003 revealed that Plaintiff was approved and took 66 hours of annual leave and 129 hours of sick leave. SUF ¶ 49. Thus, Plaintiff was granted 195 hours of leave in the course of one year. SUF ¶ 50.

### D. Request for Restoration of Leave

On March 4, 2004, Plaintiff submitted a request for restoration of annual leave, requesting that 99 hours of annual leave be restored from 2003.[14] SUF ¶ 78. The four criteria that Plaintiff was required to meet to have leave restored were:

(1) The restoration request covers leave in excess of 240 hours[;]

(2) The employee scheduled leave in writing before the beginning [of] pay period # 24[;]

(3) The employee's leave was cancelled for mission essential reasons[; and]

(4) Due to mission essential reasons, the employee's leave could not be rescheduled before the end of the leave year[.]

Defendants' App., Ex. 1b at D–0192 (Request for Restoration of Annual Leave). For leave to be considered "schedule[d] in writing," *id.*, it must be both requested and approved.[15] SUF ¶ 80.

On Plaintiff's request for restoration of annual leave form, Furtado checked off two of the four criteria, SUF ¶ 81, and recommended approval of Plaintiff's request for restoration of leave, SUF ¶ 82. However, Blythe did not sign off on the form because Plaintiff did not meet all four criteria to have her leave restored.[16] SUF ¶ 83. Blythe found that there was no prior scheduled leave that had been canceled, that Plaintiff had time to schedule her leave, and that there was no prior scheduled leave which was canceled for mission essential reasons.[17] SUF ¶ 84. Although

**12.** Plaintiff denies this fact, *see* PSDF ¶ 44, but her denial fails for essentially the same reasons as stated in n. 11.

**13.** *See* n. 11.

**14.** If a federal employee has "accumulated leave in excess of the maximum accumulation permitted by 5 CFR Section 630 . . .," Defendants' App., Ex. 1b at D–0192 (Request for Restoration of Annual Leave), and does not use that leave by the end of the calendar year, the leave is lost. However, an employee may request to have the leave restored. *See id.*

**15.** Plaintiff denies this fact, *see* PSDF ¶ 80, but the evidence she cites in support of her denial, "Defendants' Exhibit 1b," *id.*, consists of more than fifty pages. Plaintiff does not

indicate where in this collection of documents the pertinent evidence can be found. Thus, her denial is rejected for failure to comply with DRI LR Cv 56(a)(3).

**16.** Plaintiff denies this fact, *see* PSDF ¶ 83, but the evidence she cites does not contradict SUF ¶ 83.

**17.** Plaintiff denies this fact, *see* PSDF ¶ 84, but the evidence she cites, "Furtado Deposition at 123–124," *id.*, only establishes that Furtado believed that Plaintiff met two of the four criteria and that at the time he mistakenly believed this was sufficient to enable him to approve Plaintiff's request, *see* Furtado Dep. at 120–23. The fact that Plaintiff did not meet all four criteria, which was necessary to

Furtado had originally recommended approval of Plaintiff's request for restoration of leave, he later became aware that Plaintiff did not meet the criteria to have her annual leave restored.[18] SUF 85.

### E. Letter of Reprimand

On December 5, 2003, Plaintiff was in the health and beauty aids ("HBA") aisle, placing products contained in boxes on the shelves. SUF ¶ 54. Gibson instructed Plaintiff to go to "chill" to stock. SUF ¶¶ 51–52. The "chill" area was the area in the store that held boxes of cold products such as cheese, butter, milk, and eggs. SUF ¶ 53. Plaintiff refused.[19] *See* SUF ¶ 55. According to Plaintiff, she told Gibson that she was "still having problems with [her] hand," Sellers Dep. at 48, and that she was not dressed to work in chill,

*id.* Gibson's version of this initial exchange was that Plaintiff only mentioned her lack of appropriate clothing. *See* Defendants' App., Ex. 18 (Gibson Declaration ("Decl.") of 12/1/04) at D–0145. Gibson told Plaintiff that there were two jackets hanging on the wall for her to wear.[20] SUF ¶ 58. Plaintiff replied that she was not wearing other people's clothes.[21] SUF ¶ 59.

Gibson then spoke to Blythe who told Gibson to give Plaintiff another opportunity to follow her instructions. SUF ¶ 60. Gibson then instructed Plaintiff to report to chill.[22] SUF ¶ 61. Plaintiff responded that she had an injury. SUF ¶ 62. Gibson told Plaintiff that there was nothing in Plaintiff's personnel file indicating any current restrictions.[23] SUF ¶ 63. Gibson

have her request approved, is not disputed by his testimony.

18. Plaintiff denies this fact, *see* PSDF ¶ 85, but the evidence she cites, "Furtado Dep. at 124," *id.*, does not contradict SUF ¶ 85. It is true that Furtado testified at his July 31, 2007, deposition that he had only realized the day before his deposition that all four criteria had to be satisfied, *see* Furtado Dep. at 122–23, but stated in his December 1, 2004, declaration: "I am aware that the Complainant did not meet the criteria to have her annual leave restored." Defendants' App., Ex. 5 (Furtado Decl. of 12/1/04 at 3). However, this conflict as to when Furtado became aware that it was necessary for Plaintiff to meet all four criteria does not contradict the basic fact that all the criteria had to be met and that Plaintiff did not meet them.

19. *Plaintiff denies this fact, see* PSDF ¶ 55, but the evidence she cites does not support the denial, *see id.* Moreover, the evidence cited by Defendants to support this fact is Plaintiff's own declaration. *See* Defendants' App., Ex. 14 (Plaintiff's Decl. of 2/15/05) at D–0106 ("Yes, I did refuse to report to the chill area.").

20. Plaintiff denies that there were two jackets and that they were hanging up. *See* Sellers Dep. at 55 ("It's not jackets. It was one and

it was that one that was kept—just thrown on the floor.").

21. Plaintiff denies this fact, *see* PSDF ¶ 59, but the evidence she cites (her deposition testimony) does not contradict Defendants' evidence that Plaintiff replied "that she was not wearing other people's clothes." SUF ¶ 59.

22. Plaintiff admits this fact except for the word "then." PSDF ¶ 61. However, Plaintiff cites no evidence to support her refusal to admit the entire statement. *See id.* Given that Plaintiff admits that Gibson consulted Blythe regarding Plaintiff's refusal to go to chill and that he directed Gibson to give Plaintiff another opportunity to comply, SUF ¶ 60, the Court finds SUF ¶ 61 to be undisputed in its entirety.

23. Plaintiff denies this fact, *see* PSDF ¶ 63 (citing "Gibson Deposition at 77–78"), but the evidence she cites does not contradict the fact which Defendants state is undisputed. The evidence only indicates that when Gibson was deposed (more than three and a half years after the incident) she could not recall what the document in Plaintiff's personnel file reflected. *See* Gibson Dep. at 77 ("Without seeing the document, ma'am, I couldn't even be sure what I saw that day."). However, in

claims that she told Plaintiff that she would assist Plaintiff in loading the cart so that she would not have to lift heavy objects, *see* Defendants' App., Ex. 1b at D–0195, but Plaintiff denies that Gibson made this statement, *see* Sellers Dep. at 50. In any case, Plaintiff became loud and told Gibson that she would not report to the chill area.[24] SUF ¶ 65.

The medical documentation in Plaintiff's file shows that the last time Plaintiff had any medical restriction was in October 2003 when she was instructed not to lift over ten pounds.[25] SUF ¶ 66. Although in November 2003 Plaintiff's orthopedic doctor, Dr. Maher, recommended that she

be out of work for one week, he did not provide any lifting restrictions upon her return to work. SUF 67.

In addition, at the time Gibson instructed Plaintiff to work in the chill area, there was at least one jacket available to all employees to be worn in the chill area.[26] SUF ¶ 68. The jacket(s) was available for use by all employees and had been worn by other DeCA employees while in the chill area.[27] SUF ¶ 69. The employees who used the jacket(s) included white employees such as Blythe, Gibson, Bucolo, McCollum, and Nathan Fields.[28] SUF ¶ 70; Defendants' App., Ex. 32 (McCollum Decl.) ¶ 3.

---

a memorandum prepared the same day of the incident, Gibson described the entire exchange, including what occurred after she had consulted Blythe:

> At 9:55 a[.]m. I advised Ms. Sellers, who then was working on the HBA aisle, that she needed to report to the Chill Department at 10:00 a[.]m[.] to help stock. Ms. Sellers was immediately defensive and loud. She told me that she refuses to go there and stock. I told her fine. She continued with the fact that she had just had an injury[,] and she was not going to lift anything as to damage it again. I informed Ms. Sellers that she would not have to lift anything. I would load a cart for her and then she could stock it. As I have no Dr.'s note stating that she is on any kind of profile. She again refused to go to the Chill department and wished to speak to the Commissary Officer.

Defendants' App., Ex. 1b at D–0195. Similarly, in a declaration executed only a year after the incident, Gibson stated:

> She again refused and this time said she had an injury and could not work in the chill area. I was aware that she had an injury in October 2003 and was placed on a one week restriction because of the injury. I told Complainant her restriction was only for one week back in October and there was nothing in her files indicating that she had another injury or was on any restrictions.

*Id.*, Ex. 18 (Gibson Decl. of 12/1/04) at D–0145. Even putting this evidence aside, Plaintiff points to nothing in the record which

contradicts the statement that "Gibson told her that there was nothing in Plaintiff's personnel file indicating any current restrictions." SUF ¶ 63. Moreover, Plaintiff does not identify any evidence in the record which indicates that she had a medical restriction on December 5, 2003.

**24.** Plaintiff denies this fact, *see* PSDF ¶ 65, but the evidence she cites, Sellers Dep. at 50, does not contradict it. Even assuming Plaintiff disputes that she became loud, she admits that she refused to report to the chill area. *See* n. 19.

**25.** *See* n. 24 (first sentence). In addition, Plaintiff was unsure of the ending date for her light duty. *See* Sellers Dep. at 50.

**26.** *See* n. 20.

**27.** Although Plaintiff denies this fact, the evidence she cites only disputes that there were two jackets. *See* PSDF ¶ 69 (citing Sellers Dep. at 55).

**28.** *See* n. 27. While Plaintiff testified that she thought the jacket "was mainly . . . for the truck drivers," Sellers Dep. at 55, this evidence does not contradict the sworn declarations of Blythe, Gibson, Bucolo, McCollum, and Furtado, *see* SUF ¶ 70; Defendants' App., Ex. 32 (McCollum Decl.) ¶ 3, that the jacket(s) was used by them and/or other commissary employees when working or entering the chill area.

78

After Plaintiff refused to report to the chill area to stock, Gibson went to the chill area to stock as it was a priority.[29] SUF ¶ 71. Gibson loaded boxes of product to a cart, cut the boxes open, and stocked the products one at a time on the shelf.[30] SUF ¶ 72. The products stocked included items such as cheese, milk, and eggs. SUF ¶ 73. When placing the product on the shelf, the heaviest item Gibson had to put on the shelf was one gallon of milk.[31] SUF ¶ 74.

On February 25, 2004, Gibson issued Plaintiff a letter of reprimand for her failure to follow instructions and disrespectful conduct. SUF ¶ 75. Gibson was not aware of Plaintiff's EEO activity at the time she issued the Letter of Reprimand on February 25, 2004.[32] SUF ¶ 76. The Letter of Reprimand stated:

**29.** Plaintiff denies this fact, *see* PSDF ¶ 72, but vaguely cites to "Cloud Affidavit," PSDF ¶ 71, without providing any indication as to where in the record this document can be found and which paragraph(s) of the affidavit contradict SUF ¶ 71. Assuming that the Cloud Affidavit is Plaintiff's Ex. 9 (Cloud Aff.) and that Plaintiff intended to cite to ¶ 54 of the Cloud Aff. ("I read a statement by Mary Gibson which is dated December 14, 2004. This never happened."), this paragraph does not contradict SUF ¶ 71. As far as the Court can determine, there is no December 14, 2004, statement from Gibson in the record. If the statement to which Cloud intended to refer is the Gibson Decl. of 12/1/04, *see* Defendants' App., Ex. 18, that statement contains numerous facts—none of which reference Cloud. Thus, the Court has no idea what it is that Cloud asserts "never happened" or the basis for his claimed knowledge. Plaintiff's remaining citation to support her denial is "Gibson Deposition at 75," but that testimony directly supports SUF 71, *see* Gibson Dep. at 75 ("I went to—immediately went to my office, typed up the memorandum, saved it and then I went to the chill department to help put out milk and eggs.").

**30.** Although Plaintiff disputes this fact, the Court deems it admitted for essentially the same reasons stated in n. 29.

**31.** Plaintiff disputes this fact, but the evidence she cites, "Gibson Affidavit dated December 1, 2004," PSDF ¶ 74, does not contradict Defendants' App., Ex. 20 (Gibson Decl. of 11/30/07) ¶ 5, which is the stated basis for SUF ¶ 74.

**32.** Plaintiff denies this fact, *see* PSDF ¶ 76, but the "Bucolo Deposition at 163," *id.*, to which she cites, does not support the denial. Plaintiff's additional citation, "*See* Exhibit 1," *id.*, does not comply with the Local Rules. Pursuant to DRI Cv 56(a)(3), Plaintiff is required to provide "the page and line of any document to which reference is made...." DRI LR Cv 56(a)(2). Plaintiff's Ex. 1 is a hodgepodge of documents consisting of approximately 175 pages. The Court is not required to rummage through them for evidence supporting Plaintiff's denial. *See Ashley v. Paramount Hotel Grp., Inc.*, 451 F.Supp.2d 319, 323 (D.R.I.2006)("Any parties who fail to observe local rules of the district in which they practice do so at their own peril.")(citing *Ruiz Rivera v. Riley*, 209 F.3d 24, 28 (1st Cir.2000)); *see also Estate of Bennett v. Wainwright*, 548 F.3d 155, 165 (1st Cir.2008)("We have previously lauded the purpose behind local rules such as this one, which is to relieve overworked district courts by placing the burden on litigants to identify the truly disputed material facts in the record."); *Ríos–Jiménez v. Principi*, 520 F.3d 31 (1st Cir.2008)("Local Rule 56 is intended to prevent parties from shifting to the district court the burden of sifting through the inevitable mountain of information generated by discovery in search of relevant material."); *Mercado–Alicea v. P.R. Tourism Co.*, 396 F.3d 46, 51 (1st Cir.2005)("District courts are not required to ferret through sloppy records in search of evidence supporting a party's case."); *cf. Carrasquillo v. Puerto Rico, through Its Justice Dep't*, 494 F.3d 1, 4 (1st Cir.2007)("[N]on-compliance with [Local Rule 56(c)], as manifested by a failure to present a statement of disputed facts, embroidered with specific citations to the record, justifies the court's deeming the facts presented in the movant's statement of undisputed facts admitted and ruling accordingly.")(alterations in original); *Conto v. Concord Hosp., Inc.*, 265 F.3d 79, 81 (1st Cir.2001)(finding plaintiff's fact-dependent hostile work environment claim waived for failure "to cite to any record fact material to this factual inquiry").

You are hereby reprimanded for failure to follow instructions and disrespectful conduct.

Specifically, on December 5, 2003, I directed you to report for duty in the chill area to stock. I told you that jackets were available and that I would assist you by loading the cart with the items that you would stock. You became loud and told me that you would not report to that area. Although I repeatedly instructed you to report to the chill area, you still refused.

Defendants' App., Ex. 1b at D–0194; *see also* SUF ¶ 77.

### F. Change in Schedule

Plaintiff's schedule prior to December 12, 2004, was from 6:00 a.m. to 2:30 p.m.[33] SUF ¶ 87. In a memorandum dated December 6, 2004, Plaintiff was advised by Gibson that effective December 12, 2004, her work schedule would be Monday through Friday, 10:00 a.m. to 6:30 p.m. SUF ¶ 88. According to Blythe, he told Plaintiff that her schedule was being changed because there were "afternoon functions which have to be completed in

CAO." Defendants' App., Ex. 3a (Email from Blythe to Cook of 12/13/04). Plaintiff, however, denies that she was given a reason for the schedule change. *See* Sellers Dep. at 38. In an e-mail dated December 13, 2004, to DeCA Zone Manager Richard Cook, Blythe stated that he needed to know whether or not Plaintiff could do the afternoon functions of her job before he could promote her.[34] *See* SUF ¶ 90; *see also* Defendants' App., Ex. 3a. A month later, on January 16, 2005, Plaintiff's schedule was changed back to 6:00 a.m. to 2:30 p.m. SUF ¶ 91.

Plaintiff's position description provides that CAOs "[m]ay work uncommon tours of duty as required to meet [the] demands of effective mission accomplishment."[35] Defendants App., Ex. 1b at D–0181. Further, the Performance Plan for the CAO position states a "Performance Element," Defendants' App., Ex. 25 (Civilian Performance Plan), of the job as being: "Utilizing morning and afternoon daily checklist [to] provide an accurate daily assessment of all comp[o]ne[n]ts of the Computer Assisted Ordering Sys-

33. Plaintiff denies this fact, *see* PSDF ¶ 87, but the exhibit she cites, "Plaintiff's Exhibit 19," *id.*, does not exist. To the extent that Plaintiff may have intended to cite to Plaintiff's Ex. 18 (Plaintiff's Answers to Defendants' First Set of Interrogatories), that exhibit consists of 55 pages, and the Court declines to search through it looking for evidence which Plaintiff is required to cite with specificity. *See* DRI LR Cv 56(a)(3).

34. Plaintiff disputes this fact, *see* PSDF ¶ 90 (citing "Bucolo Deposition at 42"), but the evidence she cites does not contradict the fact that Blythe sent the email or that the email stated in part: "[O]n the training plan, there are functions which are only on the ... afternoon part of the checklist. I have to know whether or not she can do any of these functions before we sign off on the next level." Defendants' App., Ex. 3a (Email from Blythe to Cook of 12/13/03). Bucolo, a GS–5 level

employee, *see* Bucolo Dep. at 25, appeared to testify that there was no second shift for the CAO, *see id.* at 42, and that there were no CAO duties which had to be performed during the second or third shift, *see id.* at 43.

Q. And there was a second shift for a[CAO] person?
A. No. We worked in the morning. So I would say no.
. . . .
Q. So again, prior to the time that you began working just the third shift, there were no [CAO] duties that had to be performed during the second or third shift?
A. Yeah. Correct.
Bucolo Dep. at 42–43.

35. Plaintiff disputes this fact, *see* PSDF ¶ 93, but the evidence she cites does not contradict the fact that Defendants have accurately quoted the document they reference.

tem."[36] Defendants' App., Ex. 25. In addition, the Training Plan for Computer Assisted Ordering (CAO), states:

> Stores that have two CAOS assigned should provide overlap coverage using a work schedule for these general time frames (0600 hours through 1500 hours or 1000 hours through 1900 hours). At locations with two CAOS assigned, a later schedule when the store is not open for business[1] is the preferred arrangement, especially when CAO is first deployed to reduce/work down overwrites in the backroom.[37]

*Id.*, Ex. 1d at 32 (CAO Functions). In addition, the Training Plan provides "a 'model' task list that identifies CAO processing that will occur throughout the day and when store operational tasks should be accomplished to use the system most effectively."[38] *Id.*, at 33. These tasks include tasks between the hours of 10:00 a.m. and 6:00 p.m.[39] *Id.* at 35–38.

### G. Fourteen Day Suspension

In April of 2005, Plaintiff was suspended for fourteen days for disruptive behavior, disrespectful conduct involving a supervisor, and failure to comply with supervisory instructions. *See* Defendants' App., Ex. 1e (Memorandum from Furtado to Plaintiff of 4/11/05). The disruptive behavior was based on complaints from three employees, McCollum, Bucolo, and Johnnie Spencer, that Plaintiff had harassed them by making derogatory, disparaging, threatening, or false statements to or about them and by making offensive sounds or facial expressions when they were in Plaintiff's presence. *See id.*, Ex. 1f (Notice of Pro-

posed Suspension) at D–0408. The disrespectful conduct involved three incidents in which Plaintiff yelled or became loud and was excessively demonstrative (e.g., banging hand on chest, rolling eyes, storming out of office) during meetings with Gibson or Gibson and Furtado. *See id.* at D–0408, D–0409. The failure to comply with supervisory instructions stemmed from Plaintiff's disregard of Gibson's instructions on October 5, 2004, to provide Mike Texeira, the receiver, with a list of ordered items and failure to comply on January 24, 2005, with Gibson's instruction to assist McCollum with a task. *See id.* at D–0409.

Plaintiff was an employee covered by a collective bargaining agreement. SUF ¶ 17. The negotiated grievance procedure outlined in the MLA allows an employee to grieve "any matter relating to the employment of the employee[.]" Defendants' App., Ex. 15 (MLA) at 63. Plaintiff filed a grievance on April 26, 2005, concerning her fourteen day suspension. *See id.*, Ex. 1g at D–0404 (Grievance Form). Plaintiff was represented by her union in this grievance.[40] *See id.* In Step 1 of the grievance procedure, Plaintiff's grievance was denied by Blythe, the store director. *See id.*, Ex. 1g at D–0402 (Letter from Blythe to Ware of 5/3/05). Subsequently, the Union requested mediation, but the matter was not resolved. *See id.*, Ex. 1g at D–0394 (Letter from Cook to Ware of 6/28/05). The Union filed a "Step 2 grievance," *id.* at D–0394, on June 20, 2005, but the grievance was denied on June 28, 2005, by Zone Manager Cook, *see id.* Thereafter, the grievance was not pursued by going to the next step which was arbitration. *See id.*,

36. *See* n. 35.

37. *See* n. 35.

38. *See* n. 35.

39. *See* n. 35.

40. Plaintiff was a member of Local 190 of the American Federation of Government Employees. *See* Defendants' App., Ex. 1g at D–0401 (Letter from Ware to Covington of 5/12/05); SUF ¶ 17.

Ex. 1g at D–0393 (Email from Ware to Blythe of 7/28/05); *see also id.,* Ex. 15 at 67.

## H. Administrative EEO Complaints

### 1. First EEO Complaint

On or about May 7, 2001, Plaintiff filed her first EEO complaint.[41] SUF ¶ 97. Plaintiff alleged that she was discriminated against on the basis of race (African American) and disability (stomach ulcers) in that:

> she was subjected to harassment when she was continuously switched from work assignment to work assignment; she was continuously assigned unfavorable assignments that required working in a freezer (without a coat) and heavy lifting (without a back brace); she was assigned to work nights, 3:00 pm to 11:30 pm or 6:00 pm to 2:00 am while others were not; and she was denied the use of annual leave on April 24, 2001.

Defendants' App., Ex. 7 (Decision); *see also* SUF ¶ 98.[42] On May 21, 2003, Administrative Judge Kevin J. Berry issued a decision finding no discrimination. Defendants' App., Ex. 7. The decision was sent to Plaintiff and Attorney Steven Coaty, who was representing Plaintiff at that time. SUF ¶ 100. This decision was not appealed, and the time for appealing the decision has long passed. SUF ¶ 101.

### 2. Second EEO Complaint (Subject of this Case)

On December 18, 2003, Plaintiff contacted an EEO counselor with respect to the denial of her annual leave application by Blythe on July 14, 2003, and by Furtado on November 4, 2003.[43] SUF ¶ 102; *see also* Defendants' App., Ex. 1b at D–0064 (Memorandum from Johnson to Deputy EEO Officer of May 3, 2004, at 2), D–0071 (Counselor's Intake Sheet); Sellers Dep. at 35–36. On February 26, 2004, Plaintiff contacted an EEO counselor concerning the Letter of Reprimand issued to her on February 25, 2004.[44] SUF ¶ 103. On or about April 14, 2004, Plaintiff filed her second EEO complaint, *id.,*[45] which is the subject of this case, *see* Plaintiff's Memorandum in Support of Her Objection to Defendants' Corrected Memorandum in Support of Their Motion for Summary Judgment ("Plaintiff's Mem.") at 3.

In a letter dated June 22, 2004, Plaintiff's claims were defined as follows:

a. Whether the complainant was discriminated against based on race (Black) and reprisal (prior EEO activity) when, from July 14, 2003[,] to November 4, 2003, the Commissary Officer, Mr. John Blythe, Sr., denied her requests for annual leave on the following dates: August 7, 8, 28, 29, and 31, 2003[,] (40 hours) and No-

---

**41.** Plaintiff denies this fact, *see* PSDF ¶ 97, but she cites to "Plaintiff's Exhibit 1," *id.,* to support her denial. As already noted, this citation lacks the specificity required by LR Cv 56(a)(3). Accordingly, the fact is deemed admitted. *See* n. 32.

**42.** *See* n. 41.

**43.** Plaintiff denies this fact, but she cites "Defendants' Exhibit 12," PSDF ¶ 102, without identifying where in this 47 page exhibit the contradictory information may be found. Thus, Plaintiff's denial fails to comply with

LR CV 56(a)(3), and the Court deems SUF ¶ 102 to be admitted.

**44.** Plaintiff denies this fact, *see* PSDF ¶ 103, but she provides no citation to the record to support her denial or her assertion that "Sellers contacted the EEO about retaliation, race discrimination and different treatment by Mary Bucolo among other things," *id.* Plaintiff's denial, therefore, fails to comply with LR Cv 56(a)(3), and the Court deems SUF ¶ 103 to be admitted.

**45.** *See* n. 44.

vember 14, 15, and 18–22, 2003[.] (56 hours)?

b. Whether the complainant was discriminated against based on race (Black) and reprisal (prior EEO activity) when, on February 25, 2004, her supervisor, Ms. Mary Gibson, issued her a Letter of Reprimand for failure to follow instructions and disrespectful behavior?

c. Whether the complainant was discriminated against based on race (Black) and reprisal (prior EEO activity) when, on or about March 4, 2004, the Commissary Officer, Mr. John Blythe, Sr., disapproved her Request for Restoration of Annual Leave (96 hours)?

SUF ¶ 104.

The letter further advised Plaintiff that "[i]f you believe the issues in your complaint is [sic] not correctly defined, please notify me, in writing, within 5 calendar days after you receive this letter, and specify why you believe the issues are not correctly defined. If you fail to contact me, I will conclude you agree that the issues are properly defined." SUF ¶ 105 (alterations in original). Plaintiff did not disagree that these were the defined issues in the EEO complaint, nor did she seek to amend her EEO complaint to include claims relating to promotions and pay.[46] SUF ¶ 106. The only time Plaintiff sought to amend her EEO Complaint was to add a claim with respect to "[w]hether the complainant was discriminated against based on reprisal (prior EEO activity) when, on December 13, 2004[,] her duty

hours and work assignments were abruptly changed with no explanation?"[47] SUF ¶ 107 (quoting Defendants' App., Ex. 1b at D–0099 (Letter from Hill to Plaintiff of 12/22/04 at 1)).

On June 10, 2005, DeCA issued a final agency decision finding no discrimination based on race or retaliation regarding the EEO complaint which is the subject of this case. SUF ¶ 108.

### III. Travel

On September 2, 2005, Plaintiff filed her Complaint in this Court. *See* Docket. Subsequent to the Complaint being filed, on or about December 10, 2005, Plaintiff was removed from her employment with the Defense Commissary.[48] Plaintiff filed her Amended Complaint on January 25, 2006. *See id.* The amended pleading eliminated previous counts that alleged violation of the Civil Rights Act, 42 U.S.C. § 1981. *See* Amended Complaint. Defendants filed the instant Motion for Summary Judgment on November 30, 2007. *See* Docket. Plaintiff filed her response to the Motion on January 29, 2008. *See* Motion in Opposition to Defendants' Motion for Summary Judgment (Doc. # 41). Defendants filed a reply memorandum on February 29, 2008. *See* Defendants' Reply in Support of Their Motion for Summary Judgment (Doc. # 46) ("Defendants' Reply").

On March 10, 2008, Plaintiff's counsel sent a letter to this Magistrate Judge, the body of which stated:

---

**46.** Plaintiff denies this fact, but cites to "Plaintiff's Exhibit 2," PSDF ¶ 106, to support her denial. Plaintiff's Exhibit 2 consists of more than 65 pages, and Plaintiff fails to identify which page(s) support her denial. Thus, Plaintiff's denial fails to comply with LR Cv 56(a)(3), and the Court deems SUF ¶ 106 to be admitted.

**47.** The Court deems SUF ¶ 107 admitted for the reasons stated in n. 46.

**48.** *See* n. 3.

As you know, plaintiff did not previously provide deposition pages to which she made reference in her Opposition to Defendant's [sic] motion for summary judgment. This is because Plaintiff does not believe the applicable rules include such a requirement. However, Defendant's [sic] reply makes an issue of this. Given this, Plaintiff is enclosing the relevant transcript pages for the Court's convenience.

Letter from Andrews to Martin, M.J., of 3/10/08. Accompanying the letter were hundreds of pages of excerpts from the depositions of Sellers, Blythe, Furtado, Gibson, Bucolo, McCollum, and B. Venable.

Defendants viewed Plaintiff's communication as an improper surreply and filed an objection to it. *See* Defendants' Objection to Plaintiff's Surreply in Support of Her Opposition to Defendants' Motion for Summary Judgment and Attached Transcripts Improperly Submitted to This Court (Doc. # 47) ("Defendants' Objection to Surreply" or "Defendants' Objection"). Defendants accurately noted that "[t]he surreply and deposition transcripts were submitted to United States Magistrate Judge David L. Martin and there is no indication that these documents were filed with the Clerk as no certificate of service was attached to these documents as required by Federal Rule of Civil Procedure 5(d)." Defendants' Memorandum in Support of Their Objection to Plaintiff's Surreply in Support of Her Opposition to Defendants' Motion for Summary Judgment and Attached Transcripts Improperly Submitted to This Court ("Defendants' Objection Mem.") at 1 n. 1. Because the documents had been submitted by Plaintiff without leave of the

Court,[49] Defendants "object[ed] to the surreply and deposition transcripts being made a part of the record." *Id.* at 2.

On April 7, 2008, the Court conducted a lengthy hearing on the Motion for Summary Judgment and Defendants' Objection to Surreply. Thereafter, the Court took both matters under advisement.

## IV. Summary Judgment Standard

"Summary judgment is appropriate if 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Commercial Union Ins. Co. v. Pesante,* 459 F.3d 34, 37 (1st Cir.2006)(quoting Fed. R.Civ.P. 56(c)); *accord Kearney v. Town of Wareham,* 316 F.3d 18, 21 (1st Cir. 2002). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." *Santiago–Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46, 52 (1st Cir.2000)(quoting *Sánchez v. Alvarado,* 101 F.3d 223, 227 (1st Cir.1996)).

In ruling on a motion for summary judgment, the court must examine the record evidence "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party." *Feliciano de la Cruz v. El Conquistador Resort & Country Club,* 218 F.3d 1, 5 (1st Cir.2000)(citing *Mulero–Rodriguez v. Ponte, Inc.,* 98 F.3d 670, 672 (1st Cir. 1996)). "[W]hen the facts support plausi-

---

**49.** Local Rule Cv 7(b) provides in relevant part:

(3) No memorandum other than a memorandum in support of a motion, a memorandum in opposition, and a reply memorandum may be filed without prior leave of the Court.

DRI LR Cv 7(b)(3).

ble but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." *Coyne v. Taber Partners I*, 53 F.3d 454, 460 (1st Cir.1995). Furthermore, "[s]ummary judgment is not appropriate merely because the facts offered by the moving party seem more plausible, or because the opponent is unlikely to prevail at trial. If the evidence presented is subject to conflicting interpretations, or reasonable men might differ as to its significance, summary judgment is improper." *Gannon v. Narragansett Elec. Co.*, 777 F.Supp. 167, 169 (D.R.I.1991) (citation and internal quotation marks omitted).

The non-moving party, however, may not rest merely upon the allegations or denials in its pleading, but must set forth specific facts showing that a genuine issue of material fact exists as to each issue upon which it would bear the ultimate burden of proof at trial. *See Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d at 53 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "[T]o defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by presenting enough competent evidence to enable a finding favorable to the nonmoving party." *ATC Realty, LLC v. Town of Kingston*, 303 F.3d 91, 94 (1st Cir.2002)(quoting *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 842 (1st Cir.1993)) (alteration in original) (internal quotation marks omitted).

## V. Defendants' Objection to "Surreply" [50]

Defendants' Objection to Plaintiff's surreply is well founded. *See* Defendants' Objection Mem. at 2–3 (citing case law

which supports striking unauthorized surreply filings). Defendants point out that Plaintiff submitted approximately 134 pages of her deposition testimony but that in her memorandum (in opposition to the Motion for Summary Judgment) Plaintiff only cites to seven pages of her deposition transcript. *See id.* at 3–4. Defendants validly observe that "Plaintiff's submission of *hundreds* of pages of deposition transcripts, to which she does not even cite, can hardly be said to be 'for the Court's convenience' as Plaintiff so states in her surreply." *Id.* at 4.

Nevertheless, after consideration, the Court concludes that Defendants' Objection should be overruled for the following reasons. First, to the extent that Defendants argue that the depositions should be excluded because Plaintiff is in effect asking that the Court "sift through the record in search of evidence to support a party's opposition to summary judgment," Defendants' Objection Mem. at 4 (quoting *Stults v. Conoco, Inc.*, 76 F.3d 651, 657 (5th Cir. 1996)), the Court has already determined that it will not undertake that task, *see, e.g.*, n. 11, n. 15, n. 32, n. 33. As reflected in the footnotes in the Facts section, Plaintiff's failure to cite with specificity to evidence in the record, as required by LR Cv 56(a)(3), has resulted in the Court finding that many facts alleged in Defendants' SUF are established notwithstanding Plaintiff's denials. Accordingly, it is unnecessary for the Court to exclude the depositions on this basis.

Second, in some instances the Court has found it less cumbersome to cite directly to a deponent's deposition testimony rather than to an exhibit within Defendants' App. which contains an excerpt from that deposition. Also, the print used for some of the

---

**50.** For purposes of this discussion, the "Surreply" is the letter of Plaintiff's counsel to this

Magistrate Judge of 3/10/08 and the deposition pages which accompanied that letter.

deposition pages submitted by Plaintiff is larger than the print used in the compressed versions of the deposition excerpts found in Defendants' App. Thus, Plaintiff's pages are easier to read.[51]

Third, as counsel for Plaintiff noted at the hearing, Defendants themselves are guilty of a procedural misstep by filing the Motion for Summary Judgment without first requesting a conference with the Court as required by the Pretrial Order.[52] *See* Pretrial Order (Doc. # 5) at 1. While the parties' transgressions are not comparable,[53] the Court sees little prejudice to Defendants if the deposition filings are allowed.

Fourth, the Court has ultimately determined that the Motion for Summary Judgment should be granted. The Court deems it preferable that the record in this matter be as complete as possible.

Accordingly, as reflected in a separate order issued this same date, Defendants' Objection is overruled, and the Clerk is directed to make the deposition excerpts, which accompanied the March 10, 2008, letter from Plaintiff's counsel to this Magistrate Judge, part of the record in this case.

## VI. Claims against Dep't of Defense

■ Defendants initially request dismissal of all claims against the Department of Defense because it is not a proper defendant. The Court agrees. The only appropriate defendant in an employment discrimination action brought pursuant to Title VII against the federal government or any of its instrumentalities is the head of the agency in which the alleged discriminatory acts occurred. 42 U.S.C. § 2000e–16(c); *see also Soto v. U.S. Postal Serv.,* 905 F.2d 537, 539 (1st Cir.1990)(citing § 2000e–16(c) and stating that "[i]n cases brought against the Postal Service, the Postmaster General is the only properly named defendant"); *Mahoney v. U.S. Postal Serv.,* 884 F.2d 1194, 1196 (9th Cir. 1989) (same). Accordingly, I recommend that the Department of Defense be dismissed as a defendant in this action.[54] *See Morales v. Mineta,* 220 F.Supp.2d 88, 91 n. 1 (D.P.R.2002)(holding that Secretary of Transportation is the correct defendant for plaintiff's Title VII claims against the United States Department of Transportation and the United States Coast Guard and dismissing claims against them).

**51.** In making this observation, the Court is not suggesting that the submission of compressed versions of depositions should be avoided. It is easier to work with compressed versions as they are less cumbersome. The Court simply finds it more convenient in this instance to cite to the non-compressed version.

**52.** By way of mitigation, counsel for Defendants explained that she was the third attorney on the case for the Government and appeared to indicate that she was unaware of this particular requirement of Judge Smith's Pretrial Order.

**53.** While Defendants' counsel overlooked a single sentence in the Pretrial Order, Plaintiff's noncompliance with the rules is considerably greater. Her claim that she "does not

believe the applicable rules include ... a requirement [to provide deposition pages to which she has made reference in her Motion in Opposition to Defendants' Motion for Summary Judgment]," Letter from Andrews to Martin, M.J., of 3/10/08, flies in the face of the plain wording of LR Cv 56(a)(3) (requiring objecting party to "identify the evidence establishing the dispute[] in accordance with the requirements of paragraph (a)(2)."). Plaintiff's omission of a certificate of service as required by Fed.R.Civ.P. 5(d) and her failure to identify in the letter which depositions were being provided to the Court are also significant lapses.

**54.** Counsel for Plaintiff agreed at the hearing that the only proper defendant in this case is Robert M. Gates and that the Department of Defense should be dismissed.

## VII. Count I—Disparate Treatment

### A. Employment Discrimination Law

Employment discrimination claims arising under Title VII are analyzed under the burden-shifting method of proof outlined by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973), and further delineated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252–60, 101 S.Ct. 1089, 1093–97, 67 L.Ed.2d 207 (1981), and *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506–24, 113 S.Ct. 2742, 2747–56, 125 L.Ed.2d 407 (1993).[55] *See Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 53 (1st Cir.2000); *Domínguez–Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 430–31 (1st Cir.2000); *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 15–16 (1st Cir.1994)(explaining application of *McDonnell Douglas* and *Burdine*). The method employs a three stage framework. *See Thompson v. Coca–Cola Co.*, 522 F.3d 168, 176 (1st Cir.2008).

The Plaintiff bears the initial burden of establishing a prima facie case of discrimination. *See id.* A plaintiff meets this burden by showing that: 1) she is a member of a protected class; 2) her employer took an adverse employment action against her; 3) she was qualified for the employment she held; and 4) and her position remained open or was filled by a person whose qualifications were similar to hers. *Douglas v. J.C. Penney Co.*, 474 F.3d 10, 13–14 (1st Cir.2007); *see also Rodriguez–Torres v. Caribbean Forms Mfr., Inc.*, 399 F.3d 52, 58 (1st Cir.2005) (explaining that

"[b]ecause employment discrimination cases arise in a variety of contexts, the prima facie elements must be tailored to the given case"). The burden for establishing a prima facie case is not onerous. *Douglas v. J.C. Penney Co.*, 474 F.3d at 14; *Williams v. Raytheon Co.*, 220 F.3d 16, 19 (1st Cir.2000); *Cruz–Ramos v. Puerto Rico Sun Oil Co.*, 202 F.3d 381, 384 (1st Cir.2000); *see also Che v. Massachusetts Bay Transp. Auth.*, 342 F.3d 31, 38 (1st Cir.2003)("the prima facie case is 'a small showing that is not onerous and is easily made' ")(quoting *Kosereis v. Rhode Island*, 331 F.3d 207, 213 (1st Cir.2003) (citations and internal quotation marks omitted)).

After the plaintiff establishes a prima facie case, the burden shifts to the employer to establish a legitimate, nondiscriminatory reason for its adverse employment action. *Douglas v. J.C. Penney Co.*, 474 F.3d at 14; *Cordero–Soto v. Island Fin., Inc.*, 418 F.3d 114, 119 (1st Cir.2005); *Cruz–Ramos v. Puerto Rico Sun Oil Co.*, 202 F.3d at 384. If the employer demonstrates such a reason, the burden returns to the employee to show that the proffered reason was mere pretext and that the true reason was prohibited discrimination. *Douglas v. J.C. Penney Co.*, 474 F.3d at 14; *Cruz–Ramos v. Puerto Rico Sun Oil Co.*, 202 F.3d at 384 (stating that after employer articulates a legitimate, nondiscriminatory reason for the adverse employment action, "it falls to the plaintiff to show both that the employer's proffered reason is a sham, and that discriminatory animus sparked [its] actions")(alteration in original)(internal quotation marks omit-

---

**55.** The *McDonnell Douglas* burden-shifting analysis is applicable in cases where there is no direct evidence of discrimination and a plaintiff relies upon circumstantial evidence. *See Weston–Smith v. Cooley Dickinson Hosp., Inc.*, 282 F.3d 60, 64 (1st Cir.2002); *see also Smith v. Stratus Computer, Inc.*, 40 F.3d 11,

15 (1st Cir.1994)("When a Title VII plaintiff is unable to offer direct proof of her employer's discrimination—as is usually the case ...— we allocate the burden of producing evidence according to the now-familiar framework set forth in *McDonnell Douglas* ....").

ted); *Dichner v. Liberty Travel*, 141 F.3d 24, 30 (1st Cir.1998)("a plaintiff must show both that the employer's articulated reason is false[] and that discrimination was the actual reason for its employment action")(internal quotation marks omitted).[56]

## B. Administrative Exhaustion

■ A federal employee alleging employment discrimination must exhaust her administrative remedies before bringing a court action. *See Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 832, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976)(noting "preconditions" before an aggrieved employee may file a civil action in a federal district court to review his claim of employment discrimination); *Jensen v. Frank*, 912 F.2d 517, 520 (1st Cir.1990)("Title VII requires exhaustion of administrative remedies as a condition precedent to suit in federal district court"); *see also Velazquez–Rivera v. Danzig*, 234 F.3d 790, 794 (1st Cir.2000)(holding that fire fighter employed by Department of Navy had not exhausted administrative remedies for discrimination claim "since there had been no contact with an [EEOC] counselor within 45 days" of the date of the alleged discrimination) (citing 29 C.F.R. § 1614.105(a)(1)); *id.* ("a federal employee's failure to contact an EEOC counselor within the limitations period causes him to lose his right to pursue a later de novo action in court")(citing *Roman–Martinez v. Runyon*, 100 F.3d 213, 216–18 (1st Cir.1996)). In order to exhaust her administrative remedies, a plaintiff must contact an EEO counselor within 45 days of the allegedly discrimina-

tory incident. 29 C.F.R. § 1614.105(a)(1); *see also Machado v. Frank*, 767 F.Supp. 416, 419 (D.R.I.1991)("Failure to contact an EEO counselor within the allotted time period bars a civil action based on that event.").

### 1. Annual Leave Requests

■ Plaintiff's three leave requests, which sought leave for the dates of August 7, 8, 28, 29, and 31, 2003, were denied on July 14, 2003. *See* Defendants' App., Ex. 1b at D–0189. Thus, Plaintiff was required to contact an EEO counselor by August 28, 2003. However, Plaintiff did not contact an EEO counselor regarding the July 14, 2003, denial of her leave until December 18, 2003. SUF ¶ 102;[57] *see also* Defendants' App., Ex. 1b at D064; Sellers Dep. at 35–36 (stating that she first sought EEO counseling regarding the denial of this leave at "[t]he end of the year").

Plaintiff attempts to argue that the doctrine of accrual enables her to avoid the preclusive effect of her failure to contact an EEO counselor within the required forty-five day period. *See* Plaintiff's Mem. at 5 (citing *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir.1990)("Accrual is the date on which the statute of limitations begins to run. It is not the date on which the wrong that injures the plaintiff occurs, but the date—often the same, but sometimes later—on which the plaintiff discovers that he has been injured.")). However, Plaintiff does not identify any date after July 14, 2003, as being the date

---

**56.** The First Circuit also stated in *Dichner*, however, that "the Supreme Court's decision in *Hicks* leaves open the possibility that '[w]hen the *prima facie* case is very strong and disbelief of the proffered reason provides cause to believe that the employer was motivated by a discriminatory purpose, proof of pretext [alone] "may" be sufficient.'" *Di-*

*chner v. Liberty Travel*, 141 F.3d 24, 30 (1st Cir.1998)(quoting *Lattimore v. Polaroid Corp.*, 99 F.3d 456, 465 (1st Cir.1996)(quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993)))(alterations in original).

**57.** *See* n. 43.

on which she "discover[ed]," *Cada,* 920 F.2d at 450, that she had been injured. Rather, she asserts somewhat vaguely in her memorandum that "she was concerned, not so much with the fact that she could not take the days selected in August, but whether she was ultimately going to lose her leave by the end of the year." *Id.* at 6.

This assertion is problematic for two reasons. First, the evidence Plaintiff cites in support thereof either fails to do so or has not been provided. *See id.* (citing Plaintiff's Ex. 14 and Sellers Dep. at 35–37, 240). Plaintiff's Ex. 14 [58] is a certificate showing that Sellers completed "DeCA East CAO Training 2004," Plaintiff's Ex. 14, and provides no support for the assertion. Plaintiff has not provided page 240 of her deposition, and pages 35–37 merely reflect her testimony that she first sought EEO counseling regarding the denial of leave when she "lost a hundred—99 hours," Sellers Dep. at 36, at "[t]he end of the year," *id.* It does not indicate that Plaintiff attached a greater importance to avoiding the loss of leave than to being able to take leave on the days she selected in August. Indeed, Plaintiff was unable to recall if she had even attempted to take leave on other dates, *see* Sellers Dep. at 36–37, a matter which presumably would have stood out in her mind if her primary concern was avoiding the loss of "use or lose" leave.

■ Second, even if the Court were to accept Plaintiff's unsupported assertion, it provides an insufficient basis for application of the doctrine of accrual. A party seeking to invoke that doctrine must at least provide a coherent explanation of why the party did not know or have reason to know of the injury until a particular date. *Cf. Nieves–Márquez v. Puerto Rico,* 353 F.3d 108, 119–20 (1st Cir.2003)("the time of accrual of a civil rights action is when the aggrieved party knows or has reason to know of the injury which is the basis for his action or when facts supportive of a civil rights action are or should be apparent to a reasonably prudent person similarly situated.") Here Plaintiff has failed to do so.[59]

Accordingly, I find that Plaintiff's discrimination claim based on the denial of her leave requests on July 14, 2003, is barred by her failure to exhaust administrative remedies.[60] To the extent that the

---

**58.** To the extent that Plaintiff may have intended to cite to Plaintiff's Ex. 13 (Plaintiff's Affidavit) instead of Ex. 14, Plaintiff's citation fails to comply with LR Cv 56(a)(3) in that it lacks a paragraph or page number. To the extent that Plaintiff contends that ¶ 2 of her affidavit supports the assertion, *see* Plaintiff's Ex. 13 ¶ 2 ("After my leave was denied in July, 2003, I was under the impression that I could still use up my leave by the end of the year because of our 'use or lose policy.' "), the Court is not so persuaded. Plaintiff's statement does not indicate that she was more concerned with losing her leave than with not being able to take leave on the days selected in August. Furthermore, the fact that Plaintiff could not even remember if she attempted to take leave on other dates casts doubt on her assertion that her primary concern was being able to avoid losing leave. *See* Sellers Dep. at 36–37.

**59.** At the hearing, Plaintiff's counsel appeared to argue that Plaintiff did not know that she had been injured (with respect to the leave requests which were denied on July 14, 2003) until her request for restoration of annual leave was denied. However, this argument proves too much. Plaintiff's request for restoration of annual leave was denied in March of 2004. If Plaintiff did not know or have reason to know of the injury until that date, she could not have brought it to the attention of the EEO counselor on December 18, 2003. Yet, she did. *See* SUF ¶ 102; *see also* n. 43.

**60.** To the extent that Plaintiff's hostile work environment claim is based on the denial of these same requests, such claim is similarly barred.

Motion seeks summary judgment on such basis, it should be granted. I so recommend.

### 2. Promotions and Pay

 Defendants argue that Plaintiff also failed to exhaust her administrative remedies as to her disparate treatment claim with respect to promotion and pay.[61] In support of this argument, Defendants note the following facts. The EEO Counselor Intake Sheet, which Plaintiff signed and dated, shows that Plaintiff did not seek EEO counseling with respect to promotions and pay. *See* Defendants' App., Ex. 1b at D–0071 to D–0075. Rather, the February 4, 2004, Intake Sheet shows that Plaintiff sought EEO counseling with respect to the disapproval of leave. *See id.,* Ex. 1b at D–0071.

The March 5, 2004, Intake Sheet shows that Plaintiff sought EEO counseling with respect to a Letter of Reprimand issued on February 25, 2004. *See id.,* Ex. 1b at D–0074. Moreover, the EEO Counselor's Report shows that Plaintiff did not raise any claims with respect to promotions and pay. *See id.,* Ex. 1b at D–0063–70.

Defendants further note that at her deposition Plaintiff could not remember whether or not she contacted an EEO counselor with respect to these issues.

Q. And when did you seek EEO counseling regarding the denial of the promotion?

. . .

A. I don't remember going because I was rejected. It was just a combination of that, plus being suspended. I think that's when all this was coming up. It was when I was suspended.

Q. Did you file an EEO complaint regarding the denial of a promotion?

. . .

A. I don't recall if I did.

Sellers Dep. at 21–22.

In addition, Defendants point out that in her second EEO Complaint, Plaintiff did not mention any claims with respect to promotions and pay. *See* Defendants' App., Ex. 12 at D–0045. Defendants also note that Plaintiff never amended her second EEO complaint to include those issues even though she was given the opportunity to do so. *See id.,* Ex. 1b at D–0096 (Letter from Hill to Sellers of 6/22/04).

Plaintiff responds by citing "the scope of the investigation rule," Plaintiff's Mem. at 6 (internal quotation marks omitted), which holds that "the 'scope' of the judicial complaint is limited to the 'scope' of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination," *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 466 (5th Cir. 1970); *see also Johnson v. Gen. Elec.,* 840 F.2d 132, 139 (1st Cir.1988)("A complaint related to that brought before the EEOC, but which was not itself made the subject of a separate EEOC complaint, must reasonably be expected to have been within the scope of the EEOC's investigation in order to meet the jurisdictional prerequisite."), *abrogated by Clockedile v. New Hampshire Dep't of Corr.,* 245 F.3d 1, 4 (1st Cir.2001).[62] Plaintiff asserts that "[i]n

---

**61.** Plaintiff admits that her claim with respect to promotion and pay is "one and the same." Plaintiff's Mem. at 6 n. 8.

**62.** Although in *Clockedile v. New Hampshire Department of Corrections,* 245 F.3d 1 (1st Cir.2001), the First Circuit abandoned the rule stated in *Johnson v. General Electric,* 840 F.2d 132, 139 (1st Cir.1988), with respect to retaliation claims, *see Clockedile,* 245 F.3d at 4, 6, the Court declined to take a position for non-retaliation claims or additional claims of discrimination which were never presented to the administrative agency, *Russell v. Enter. Rent–A–Car Co. of Rhode Island,* 160 F.Supp.2d 239, 263 n. 6 (D.R.I.2001); *cf. id.* ("Therefore, while the *Clockedile* decision is

light of the numerous instances where plaintiff's failure to be promoted to a GS–7 was raised both by plaintiff and by management in the course of the EEOC investigation, clearly the EEOC's investigation should have uncovered this claim." Plaintiff's Mem. at 8 (footnote omitted).

This assertion is unpersuasive because Plaintiff fails to identify where in the record evidence of these "numerous instances" can be found other than the inadequate citation "See Plaintiff's Exhibit 2," Plaintiff's Mem. at 7–8. The Court has already noted that such a general citation is inadequate. *See* n. 46 *supra*; *cf. Surprenant v. Rivas*, 424 F.3d 5, 21 (1st Cir.2005)("It is counsel's job ... to mine the record and prove the alleged error, not to offer suggestive hints and leave the rest of the work to a busy court."). Thus, Plaintiff has not shown that her race claim with respect to the denial of promotions and pay falls within the scope of the EEOC investigation. *See Lattimore v. Polaroid Corp.*, 99 F.3d 456, 464 (1st Cir.1996) ("[I]n employment discrimination cases, [t]he scope of the civil complaint is ... limited by the charge filed with the EEOC and the investigation which can reasonably can be expected to grow out of that charge.") (quoting *Powers v. Grinnell Corp.*, 915 F.2d 34, 38 (1st Cir.1990)) (second and third alterations in original); *Ladenheim v. American Airlines, Inc.*, 115 F.Supp.2d 225, 233 (D.P.R.2000) ("A plaintiff in his administrative charge must describe the essential nature of the claim and ... identify the core facts on which it rests.")(alteration in original) (internal quotation marks omitted).

Even if the Court were to overlook Plaintiff's noncompliance with the Local Rules, Plaintiff's argument that the EEOC should have uncovered Plaintiff's failure to promote claim is unpersuasive. *See Kenney v. MML Investors Servs., Inc.*, 266 F.Supp.2d 239, 247 (D.Mass.2003)(rejecting plaintiff's argument that the scope of her civil action should not be determined by the agency charge but by what the EEOC "was given the opportunity to do"). Accordingly, except to the extent that the denial of promotions and pay is part of Plaintiff's retaliation claim, *see Clockedile*, 245 F.3d at 6, Plaintiff has failed to exhaust her administrative remedies. Thus, her promotions and pay claim is otherwise barred.

### 3. Fourteen Day Suspension

■ Defendants argue that Plaintiff failed to exhaust her remedies as to any race or retaliation claim concerning her fourteen day suspension because she elected to pursue the negotiated grievance procedure concerning it and failed to take the grievance to arbitration, the final step of such process. *See* Defendants' Corrected Memorandum in Support of Their Motion for Summary Judgment ("Defendants' Mem.") at 24; *see also Frasure v. Principi*, 367 F.Supp.2d 245, 252 (D.Conn.2005)(explaining that "[t]he Federal Labor–Management Relations Act provides that a federal employee may raise claims of discrimination under a negotiated grievance procedure or in a Title VII complaint, but not both")(citing 5 U.S.C. § 7121(d)); *id.* at 253 ("Whichever route the employee chooses, she must then exhaust that administrative remedy before pursuing her claim in court."); *O'Dwyer v. Snow*, No. 00CIV8918 (LTD)FM, 2004 WL 444534, at *8 (S.D.N.Y. Mar. 10, 2004)("These formal, written grievances ... constituted irrevocable elections to pursue those issues through the union procedures. Thus, for these claims to be ac-

---

authoritative in resolving the motion for summary judgment on plaintiff's retaliation claim,

it has no effect on the Court's decision to dismiss plaintiff's disparate impact claim.").

tionable in this Court, Plaintiff must have exhausted the grievance procedure set out in her union's collective bargaining agreement.") (internal citation omitted); *accord Guerra v. Cuomo*, 176 F.3d 547, 548–49 (D.C.Cir.1999)(interpreting § 7121(d) and affirming district court's dismissal of plaintiff's complaint where she "failed to exhaust her remedies under the grievance procedures . . .").

Petitioner responds to this argument by asserting in a footnote that "[i]t was the union—and not Sellers—who decided not to pursue her grievance to the final step of arbitration." Plaintiff's Mem. at 10 n. 10. Plaintiff cites no evidence to support this assertion.[63] Accordingly, the Court rejects Plaintiff's assertion for lack of support.

Even if the Court were to assume that Plaintiff sought to take her grievance to arbitration and that the union refused, Plaintiff still failed to exhaust her administrative remedies because she never argued on her grievance form that the discipline imposed was due to race or retaliation. *See* Defendants' App., Ex. 1g at D–0404.

Therefore, she failed to exhaust her administrative remedies as to any race or retaliation claim concerning the suspension. *See Redmon v. Mineta*, 243 Fed. Appx. 920, 925–26 (6th Cir.2007)(holding that plaintiff failed to exhaust her administrative remedies where she did not raise her Title VII claims in the union grievance procedure). Accordingly, Plaintiff is barred from litigating these claims in this Court, *see id.* at *5 (finding summary judgment properly granted where plaintiff failed to exhaust her administrative remedies).[64]

## C. Prima Facie Case

In setting out her prima facie case, Plaintiff must show: 1) she is a member of a protected class; 2) she was performing satisfactorily so as to meet her employer's legitimate job-performance expectations; 3) she suffered some adverse employment actions at the hands of her employer; and 4) she was treated less favorably than similarly situated persons outside her protected class.[65] *Ashley v. Paramount Hotel*

**63.** To the extent that Plaintiff may contend that Defendants' App., Ex. 1g at D–0393 (Email from Ware to Blythe of 7/28/05) supports her assertion that it was the union and not Plaintiff that decided not to pursue the grievance, the Court finds this evidence insufficient. There is nothing in the memorandum from Ware to Blythe of 7/27/05 which indicates that the union's action was contrary to Plaintiff's wishes or made over her objection. *See* Defendants' App., Ex. 1g at D–0393 ("Since the letter of reprimand is still being litigated, this local is choosing not to pursue this case at this time.").

**64.** Defendants also argue that even if Plaintiff had alleged discrimination and retaliation claims in the union grievance procedure and that she petitioned the union to pursue arbitration and the union denied her request, Defendants are still entitled to summary judgment because Plaintiff provides no evidence that she filed a timely appeal with the EEOC after DeCA denied her grievance in Step 2 of

the grievance procedure. *See* Defendants' Reply in Support of Their Motion for Summary Judgment (Doc. # 46) ("Defendants' Reply") at 8 (citing 5 U.S.C. § 7121(d); 29 C.F.R. § 1614.401(a)); *see also Quint v. A.E. Staley Mfg. Co.*, 172 F.3d 1, 8 n. 2 (1st Cir.1999)(noting that prior to filing suit plaintiff had filed a timely claim with the Equal Employment Opportunity Commission after her union declined to proceed with arbitration with respect to her grievance). The Court agrees that Plaintiff's claims based on her fourteen day suspension are barred for this additional reason.

**65.** Plaintiff seemingly takes issue with this formulation, asserting that the First Circuit has explicitly rejected the notion that a Plaintiff is required to proffer comparable evidence in order to establish her prima facie case. *See* Plaintiff's Mem. at 12 (citing *Fernandes v. Costa Bros. Masonry, Inc.*, 199 F.3d 572, 584 (1st Cir.1999)); *see also Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 19 (1st

*Grp., Inc.*, 451 F.Supp.2d 319, 330 (D.R.I. 2006); *see also Rathbun v. AutoZone, Inc.*, 361 F.3d 62, 71 (1st Cir.2004)("The elements of the plaintiff's prima facie case vary according to the nature of her claim."); *Lehman v. Prudential Ins. Co. of America*, 74 F.3d 323, 328 n. 4 (1st Cir. 1996) ("[T]he facts necessary to establish a prima facie case of discrimination will vary depending on the circumstances of each case.")(alteration in original). With the exception of Plaintiff's claim based on the fourteen day suspension (which the Court finds is barred for failure to exhaust her administrative remedies and which the Court elects not to discuss further), Plaintiff's claims are discussed within the following sections only to the extent that a particular claim fails to satisfy the particular prong of the *McDonnell Douglas* burden shifting test being discussed.

### 1. Less Favorable Treatment

Defendants argue that Plaintiff is unable to show that she was treated less favorably than similarly situated non-black employees and that therefore she is unable to establish a prima facie case. In considering this argument, the Court bears in mind that a plaintiff's burden in establishing a

prima facie case is a modest one. *Cardona Jimenez v. Bancomercio de Puerto Rico*, 174 F.3d 36, 41 (1st Cir.1999); *see also Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. at 252, 101 S.Ct. 1089 ("The burden of establishing a prima facie case of disparate treatment is not onerous."); *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 15 (1st Cir.1994)(describing burden as "relatively light"). "All that is needed is the production of admissible evidence which, if uncontradicted, would justify a legal conclusion of discrimination." *Sanchez v. Puerto Rico Oil Co.*, 37 F.3d 712, 719 (1st Cir.1994).

#### a. Annual Leave Requests

■ Plaintiff cannot show that she was treated less favorably than those outside of her protected class with respect to the denial of her annual leave requests because all employees were required to submit leave planners,[66] *see* SUF ¶ 24; *see also* Defendants' App., Ex. 15 at 30, and Plaintiff was the only employee who failed to submit a leave planner as required, *see* Defendants' App., Ex. 17 (Furtado Decl. of 12/1/04) at D–0153 ("The Complainant was the only person under my supervision who did not submit a leave planner."); Blythe

---

Cir.1999)(agreeing that "the time to consider comparative evidence in a disparate treatment case is at the third step of the burden-shifting ritual, when the need arises to test the pretextuality *vel non* of the employer's articulated reason for having acted adversely to the plaintiff's interest"). However, Plaintiff's formulation of the elements of her prima facie case is inapplicable to this action which does not involve her dismissal. *See* Plaintiff's Mem. at 12 (stating the third and fourth elements of a prima facie case as "(3) she was nevertheless dismissed; and (4) after her departure, the employer sought someone of roughly equivalent qualifications to perform substantially the same work"). This Court concludes that the formulation stated in *Ashley v. Paramount Hotel Group, Inc.*, 451 F.Supp.2d 319, 330 (D.R.I.2006), is correct for the circumstances of this case. If the

Court were to limit the formulation to the first three elements stated in *Ashley*, there would be no basis for an inference of discrimination from such a showing, and a prima facie case raises an inference of discrimination. *See Ingram v. Brink's, Inc.*, 414 F.3d 222, 230 (1st Cir.2005) ("If a prima facie case is made out, an inference of discrimination is raised ...."); *cf. Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3rd Cir.2004)(stating that while prima facie elements of a discrimination claim vary depending on the particular facts of the case, "the plaintiff must generally present evidence that 'raises an inference of discrimination.' ") (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)).

**66.** *See* n. 8.

Dep. at 270. Thus, Plaintiff cannot show that any other employee outside her protected class was treated more favorably than she with respect to annual leave requests. *Smith v. Stratus Computer, Inc.,* 40 F.3d at 17 ("In a disparate treatment case, the plaintiff has the burden of showing that she was treated differently from persons similarly situated *in all relevant aspects.*")(internal quotation marks omitted).

Plaintiff argues that the leave planner was only a "guide" to ensure that employees working in the same job and same department would not be taking leave at the same time and that an employee could still take leave even if she had not submitted a leave planner. *See* Plaintiff's Mem. at 34–35. Plaintiff attempts to distinguish herself from McCollum, "a similarly situated white person[,]" *id.* at 35, who in fact "was denied leave because he sought to take days off previously selected by Sellers," *id.* Plaintiff asserts that "unlike Sellers, McCollum was not denied leave. Rather, he [was] only not allowed to take leave on the dates he selected." *Id.* However, in making this statement, Plaintiff apparently overlooks the fact that she requested and was granted annual leave from October 22–24, 2003. SUF ¶¶ 37–38. Thus, just like McCollum, Plaintiff was not denied annual leave, but only denied leave on some of the dates she selected.[67]

Accordingly, with respect to the denial of Plaintiff's leave requests, I find that Plaintiff has failed to establish a prima

facie case of discrimination because she is unable to present evidence which raises an inference of racial discrimination. There is simply nothing in the fact that her requests for leave were denied which "would justify a legal conclusion of discrimination." *Sanchez v. Puerto Rico Oil Co.,* 37 F.3d at 719.

### b. Restoration of Leave

Plaintiff similarly cannot establish a prima facie case with respect to the denial of her request for restoration of leave because she cannot point to competent evidence of similarly situated employees outside of her protected class who were treated more favorably with respect to the restoration of annual leave. Furtado has never recommended, nor denied, approval of a request for restoration of annual leave other than for Plaintiff. *See* Furtado Dep. at 123. Thus, Plaintiff has failed to establish a prima facie case with respect to the denial of her restoration of leave request.

### c. Change in Work Schedule

Defendants argue, and the Court agrees, that Plaintiff cannot establish that she was treated less favorably than those outside her protected class with regard to the schedule change on December 12, 2004. Both McCollum and Bucolo, who were both white, had their work schedules changed numerous times in the CAO position. *See* Defendants' App., Ex. 9 (Bucolo Decl.) ¶ 4;[68] *Id.,* Ex. 32 (McCollum Decl.)

---

**67.** Plaintiff states that she "agrees that she should not have been able to take leave in either August or November[,] 2003 if William McCollum—who was in her department and did her job—had previously selected her dates." Plaintiff's Mem. at 35. However, she claims that "defendants submitted to the EEO a document reflecting the leave taken by employees during 2003," *id.,* and that "[t]his document does *not* reflect that McCollum was on leave the days selected by Sellers," *id.*

Plaintiff provides no citation as to where this document can be found in the record, and the Court finds Plaintiff's claim to be unsupported.

**68.** Bucolo states that:

While I have been in the CAO position, I have worked these hours: 8:30 p.m. to 5:00 a.m., 6:00 a.m. to 2:30 p.m., 6:00 p.m. to 2:30 a.m., 9:00 a.m. to 5:30 p.m., and 10:00/10:30 p.m. to 6:00/6:30 a.m.

¶ 2.[69] There is nothing in the record to which Plaintiff can point relative to the change in her hours which "would justify a legal conclusion of discrimination." *Sanchez v. Puerto Rico Oil Co.*, 37 F.3d at 719.

## 2. Adverse Action

■■■ An adverse employment action is one which materially alters a term or condition of employment. *See Bishop v. Bell Atl. Corp.*, 299 F.3d 53, 59 (1st Cir.2002).

> Typically, the employer must either (1) take something of consequence from the employee, say, by discharging or demoting her, reducing her salary, or divesting her of significant responsibilities, or (2) withhold from the employee an accouterment of the employment relationship, say, by failing to follow a customary practice of considering her for promotion after a particular period of service.

*Simas v. First Citizens' Fed. Credit Union*, 170 F.3d 37, 49 (1st Cir.1999)(quoting *Blackie v. Maine*, 75 F.3d 716, 725 (1st Cir.1996)); *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."). Although actions short of termination may constitute adverse actions within the meaning of Title VII, not everything that makes an employee unhappy is an actionable adverse action. *Montandon v. Farmland Indus., Inc.*, 116

F.3d 355, 359 (8th Cir.1997); *see also Box v. Principi*, 442 F.3d 692, 696 (8th Cir. 2006)("A materially adverse action must be more disruptive than a mere inconvenience or an alteration of job responsibilities.")(internal quotation marks omitted).

Determining whether an action is materially adverse necessarily requires a case-by-case inquiry. *Simas*, 170 F.3d at 49. Moreover, the inquiry must be cast in objective terms. *Id.* at 50. "Work places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action." *Bishop v. Bell Atl. Corp.*, 299 F.3d at 59 (quoting *Blackie v. Maine*, 75 F.3d at 725).

### a. Denial of Annual Leave Requests

As already noted, *see* Part VII.C.1.a. *supra* at 93, the Court rejects Plaintiff's suggestion that she was denied permission to take any leave. Rather, Plaintiff was simply denied permission to take leave on some of the days she requested. She was not denied the ability to use her allotted leave time. Indeed, Plaintiff could not even remember if she attempted to take leave on other dates after Furtado denied her leave request on November 4, 2003. *See* Sellers Dep. at 37.

■■■ Given Plaintiff's failure to schedule her leave earlier (by submitting a leave planner as required by the MLA) and in the context of her leave record showing numerous times where she had been granted annual leave,[70] the denial of Plain-

---

Defendants' App., Ex. 9 (Bucolo Decl.) ¶ 4.

**69.** McCollum states that:

> I have worked afternoon hours as CAO. My schedule has changed so much that I do not remember all the hours that they were changed to. Some of the hours that I have ... worked as CAO were 6:00 a.m. to 2:30 p.m., 10:00 p.m. to 6:30 a.m., 8:00 a.m. to

4:30 p.m., 5:00 a.m. to 1:00 p.m., and 4:00 a.m. to 12:30 p.m.

*Id.*, Ex. 32 (McCollum Decl.) ¶ 2.

**70.** In the prior EEO complaint, Plaintiff alleged that she was wrongfully denied annual leave in 2001. The Administrative Law Judge who addressed her complaint wrote that: "The record shows that the Complainant was

tiff's leave requests does not constitute an adverse action. *See Box v. Principi*, 442 F.3d at 697 (holding that plaintiff's claim regarding her denial of annual leave on one date "fall[s] short of showing an adverse employment action"); *Allen v. Potter*, 115 Fed.Appx. 854, 861 (7th Cir. 2004)("When the several denials of leave are considered in the context of [plaintiff's] entire leave record, the four denials in 1991 and the one denial in each of the other years (1992, 1999, and 2000) cannot be said to be anything more than 'a mere inconvenience.'"); *Pitchford v. Potter*, No. 3:30CV00374, 2007 WL 1020467, at *10 (E.D.Ark. Mar. 30, 2007)(holding that "[a] reasonable person in plaintiff's position would have scheduled his leave earlier and avoided any harm. But for plaintiff's inaction there would have been no denial of leave"); *Mihalko v. Potter*, Civil Action No. 00–2076, 2003 WL 23319594, at *6 (W.D.Pa. Dec. 12, 2003)("Plaintiff's allegations that he was denied annual and family leave . . .—even when construed in the most favorable light to the [p]laintiff— simply do not constitute adverse employment actions.").

The cases cited by Plaintiff in support of her contention that the denial of her leave requests constitutes an adverse employment action are distinguishable or otherwise unpersuasive. In *Allah v. City of New York Department of Parks & Recreation*, 47 Fed.Appx. 45 (2nd Cir.2002)(unpublished opinion), the plaintiff suffered the loss of vacation days and pay as a result of being found guilty at a disciplinary proceeding. *See id.* at 47. In contrast, here Plaintiff suffered no loss of pay, and the denials were not part of any discipline imposed on her. Similarly, in *Coffman v. Tracker Marine, L.P.*, 141 F.3d

1241 (8th Cir.1998), the plaintiff had previously been allowed to take all federal holidays off with pay and the denial of these vacation days was functionally equivalent to a loss of pay. *See id.* at 1243, 1245.

The court in *Mendoza v. Sysco Food Services of Arizona, Inc.*, 337 F.Supp.2d 1172 (D.Ariz.2004), did not actually hold that denying an employee's vacation preference is an adverse employment action. *See id.* at 1192. Rather, the court only inferred that it could be, based on *Brooks v. City of San Mateo*, 229 F.3d 917 (9th Cir.2000). In *Brooks*, the Ninth Circuit affirmed the district court's rejection of plaintiff's retaliation claim (which was based on the city's rescheduling plaintiff to an unfavorable shift and denial of her vacation preference) because the city accommodated plaintiff's preferences by allowing her to switch shifts and vacation dates with other employees. *See id.* at 930. Thus, the inference the *Mendoza* court made is based entirely on the fact that the Ninth Circuit in *Brooks* failed to also state that a denial of a vacation preference cannot constitute an adverse employment action. This is too slender a reed to be persuasive to this Court.

The vacation time at issue in *Dimitrov v. Seattle Times Co.*, No. 98–36156, 2000 WL 1228995, 2000 U.S.App. LEXIS 22402 (9th Cir. Aug. 29, 2000) (unpublished opinion), an additional case cited by Plaintiff, is also factually distinguishable from the annual leave requested by Plaintiff in the instant case. In *Dimitrov*, the employer changed its policy with respect to vacation credit for time off-work due to on-the-job injuries. *See id.* at *3, 2000 U.S.App. LEXIS 22402 at *10. Under the former policy, employees, including the plaintiff, who suffered on-the-job injuries received

granted and used more annual leave in the previous year than only one other worker."

Defendants' App., Ex. 7 at P–0138.

vacation credit for those periods of time that they were unable to work. *See id.* After the dispute with the plaintiff arose, the employer changed the policy so that injured workers would not receive vacation credit for time missed due to injuries. *See id.* Thus, the change resulted in a direct financial loss to the plaintiff.

Similarly, in *Donaldson v. Governors State University,* Case No. 98 C 4988, 2001 WL 1593144, 2001 U.S. Dist. LEXIS 20697 (N.D.Ill. Dec. 13, 2001), the plaintiff, a college professor, was assigned to teach a summer class which cut into his scheduled vacation time. *See id.* at *1–2, 2001 U.S. Dist. LEXIS 20697 at *4. The assignment resulted in an actual financial loss to the plaintiff as evidenced by the fact that an arbitrator subsequently ruled that the university had to compensate plaintiff for working during his scheduled vacation time. *See id.* at *2 n. 1, 2001 U.S. Dist. LEXIS 20697 at *4 n. 1. The court noted that the arbitrator's decision weakened the plaintiff's prima facie case, *see id.* at *3 n. 2, 2001 U.S. Dist. LEXIS 20697 at *7 n. 2, and found that he was "just barely ... able to show that the loss of vacation and personal development time was an adverse employment action," *id.* at *3, 2001 U.S. Dist. LEXIS 20697 at *7. Given that here the denial of Plaintiff's requests to take annual leave on particular days in 2003 did not necessarily mean she would suffer a final loss of leave time, this Court finds *Donaldson* to be distinguishable and unpersuasive.

Thus, the Court finds that the denial of annual leave on the dates requested does not constitute an adverse action.

### b. Change in Schedule

Prior to December 12, 2004, Plaintiff worked from 6:00 a.m. to 2:30 p.m.[71] SUF ¶ 87. For a period of four weeks, her schedule was changed to 10:00 a.m. to 6:30 p.m. SUF ¶¶ 88, 91. A four hour change in working hours for a period of only four weeks is not sufficient to rise to the level of an adverse employment action. *See Grube v. Lau Indus., Inc.,* 257 F.3d 723, 729–30 (7th Cir.2001)(holding that transfer of plaintiff from first to second shift did not constitute an adverse employment action); *id.* at 729 ("Title VII simply was never intended to be used as a vehicle for an employee to complain about the hours she is scheduled to work"); *Benningfield v. City of Houston,* 157 F.3d 369, 377 (5th Cir.1998)(rejecting plaintiff's argument that transferring her to the night shift constitutes an adverse employment action);[72] *see also Keeton v. Flying J, Inc.,* 429 F.3d 259, 268 (6th Cir.2005)("These business decisions may be adverse employment actions but only if they are more disruptive than a mere inconvenience or an alteration of job responsibilities.")(internal quotation marks and citations omitted).

### 3. Summary Re Prima Facie Case

Plaintiff is unable to establish a prima facie case of disparate treatment with respect to the denial of her requests for annual leave and restoration of leave and the change in her work schedule because she is unable to show that she was treated less favorably than those outside her protected class with respect to those matters. In addition, Plaintiff is unable to show that

---

71. *See* n. 33.

72. In *Burlington Northern & Santa Fe Railway Co. v. White,* the Supreme Court observed that "[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children." 548 U.S. 53, 69, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006). Here, however, Plaintiff has not pointed to any evidence suggesting that the schedule change imposed any special hardship on her.

the denial of her requests for leave on particular dates and the change in her schedule for four weeks constitute adverse employment actions.

## D. Nondiscriminatory Reasons

At the second step of the *McDonnell Douglas* burden-shifting framework, Defendants have the burden of articulating a legitimate, nondiscriminatory reason for the adverse action. *See Conward v. Cambridge Sch. Comm.*, 171 F.3d at 19 (citing *McDonnell Douglas*, 411 U.S. at 802–03, 93 S.Ct. 1817). They have done so. The Court discusses Defendants' reasons in the context of Plaintiff's arguments regarding pretext.

## E. Pretext

Although Plaintiff has failed to establish a prima facie case with respect to certain claims identified in the "Summary" above, the Court will, nevertheless, continue to include them in its analysis of Plaintiff's claim of disparate treatment. The Court does so to provide an alternative basis for its holding in this matter. *See Conward v. Cambridge Sch. Comm.*, 171 F.3d at 20 (affirming summary judgment on race discrimination claims where district court's alternative holding that plaintiff's evidence "was too weak to show *at the third step of the progression* that the defendants' stated reason for firing him masked a racially discriminatory animus").

Because Defendants have provided non-discriminatory reasons for their actions, Plaintiff must offer evidence showing that each of Defendants' proffered reasons is a sham and that discriminatory animus sparked Defendants' actions. *See id.* at 19 (citing *McDonnell Douglas*, 411 U.S. at 804–05, 93 S.Ct. 1817).

### 1. Comparative Evidence

█ Evidence of past treatment towards others can be used to demonstrate intent in a race discrimination suit. *Dartmouth Review v. Dartmouth Coll.*, 889 F.2d at 19. However, parties offering such evidence must "identify and relate specific instances where persons situated similarly 'in all relevant aspects' were treated differently." *Id.* (quoting *Smith v. Monsanto Chem. Co.*, 770 F.2d 719, 723 (8th Cir.1985)). In general, this requires that the other incidents' circumstances be "reasonably comparable" to those surrounding the adverse action taken against plaintiff. *See id.* "The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated.... Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples." *Id.; see also Rodriguez–Cuervos v. Wal–Mart Stores, Inc.*, 181 F.3d 15, 21 (1st Cir.1999) ("[I]n offering ... comparative evidence, [plaintiff] bears the burden of showing that the individuals with whom he seeks to be compared 'have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'")(quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir.1992)); *Perkins v. Brigham & Women's Hosp.*, 78 F.3d 747, 751 (1st Cir.1996)("A claim of disparate treatment based on comparative evidence must rest on proof that the proposed analogue is similarly situated in material respects.")

█ Plaintiff devotes a substantial portion of her memorandum to arguing that non-whites were treated differently with respect to discipline at the Newport commissary. *See* Plaintiff's Mem. at 17–30. Plaintiff cites incidents involving other employees and Blythe and/or Furtado and the discipline (or lack thereof) such employees

received for the alleged misconduct. However, the only discipline which remains at issue is the letter of reprimand issued by Gibson. *See* Part VII.B.3. *supra* at 91 (finding claim based on fourteen day suspension barred for failure to exhaust administrative remedies); Part VII.C. *supra* at 91–92 (declining to discuss fourteen day suspension further). Accordingly, incidents which do not involve the imposition or withholding of discipline by Gibson are not comparable. Gibson was a first-level supervisor, and Blythe and Furtado were, respectively, third and second level supervisors. Their positions were not equivalent to Gibson's. *See Dartmouth Review v. Dartmouth Coll.*, 889 F.2d at 19; *see also Walker v. Ohio Dep't of Rehab. and Corr.*, 241 Fed.Appx. 261, 266 (6th Cir.2007)(unpublished opinion)(quoting *Mitchell v. Toledo Hosp.*, 964 F.2d at 583); *Mejias Miranda v. BBII Acquisition Corp.*, 120 F.Supp.2d 157, 165 n. 7 (D.P.R.2000)(quoting *Mitchell v. Toledo Hosp.*, 964 F.2d at 583).

▮▮▮ Thus, the Court will discuss only the incidents Plaintiff cites which involve Gibson and other employees.[73] *See Ineichen v. Ameritech*, 410 F.3d 956, 960–61 (7th Cir.2005)(holding that to satisfy "similarly situated" requirement Plaintiff must "show not only that the employees reported to the same supervisor, engaged in the same conduct, and had the same qualifications, but also show that there were no 'differentiating or mitigating circumstances as would distinguish ... the employer's treatment of them' ")(quoting *Radue v. Kimberly–Clark Corp.*, 219 F.3d 612, 617–18 (7th Cir.2000)) (alteration in original); *Childs–Pierce v. Util. Workers Union of Am.*, 383 F.Supp.2d 60, 70 (D.D.C.2005) (holding that "the co-workers must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it")(internal quotation marks omitted). As explained in the following discussion, the Court does not find such incidents to be comparable.

### a. William McCollum

Plaintiff cites the fact that Gibson testified that McCollum was rude to her on "maybe, four times," Gibson Dep. at 221, but Gibson did not "write him up," *id.* Plaintiff also asserts that Gibson testified that McCollum refused to do things she asked him. *See* Plaintiff's Mem. at 20. However, this assertion overstates Gibson's testimony. Gibson indicated that as far as she could recall McCollum always complied with her directives although he may not have done so immediately.[74]

---

73. Plaintiff asserts that "this Court has held that a plaintiff does not have to limit her comparison only to other employees disciplined by the same supervisor," Plaintiff's Mem. at 16, but cites no authority for this statement, *see id.* From the context, it appears that Plaintiff actually has in mind the court in *Petsch–Schmid v. Boston Edison Co.*, 914 F.Supp. 697, 705 n. 17 (D.Mass.1996)(rejecting contention that employee must compare herself with other employees disciplined by the same supervisor where "a company has instituted company-wide standards of discipline ... intended to provide guidance to all company supervisors"). Plaintiff has cited no evidence that would permit the Court to make a finding equivalent to the one made by the *Petsch–Schmid* court, and this Court is unpersuaded that holding should be applied in the instant circumstances.

74. Gibson testified:

 Q. And did [McCollum] ever refuse to do anything that you told him to do?
 A. Not to my knowledge.
 Q. Even for a short time?
 A. Yeah. He did no more than what any other employee, "well, I don't want to do it," but he would go and do it before the end of his shift.

Plaintiff identifies no incident where McCollum ever flatly refused to comply with a direct order from Gibson and was openly disrespectful in the process.

Plaintiff describes an incident involving a verbal altercation between McCollum and another employee whose first name was Tina. *See* Plaintiff's Mem. at 21. According to Plaintiff, a few after days after the incident, Gibson told McCollum that they were going to have a meeting with the store director. Plaintiff continues:

> McCollum—who did not believe that Gibson should be present—walked away from Gibson without saying a word. McCollum went directly to the Store Director's office and told him that he was not going to attend any meeting with Gibson. Significan[t]ly, McCollum testified that neither he nor Tina were disciplined.

Plaintiff's Mem. at 21. Plaintiff provides no citations to support her description of this entire incident. Thus, the Court is unable to determine whether the facts are as alleged by Plaintiff and whether there are factors which distinguish the conduct of McCollum and Tina.

Plaintiff cites the fact that Gibson heard from different employees that McCollum, who was supposed to start work at 4:00 a.m., was not coming in until almost six o'clock. *See* Plaintiff's Mem. at 21; *see also* Gibson Dep. at 173–76. Gibson spoke to Furtado about the reports, and as a result McCollum's shift was changed back to 6:00 a.m. to 2:30 p.m. See Gibson Dep. at 177. McCollum was not disciplined. *See id.* at 178. Plaintiff suggests that the fact that McCollum was not disciplined, but she was, is evidence of pretext. *See* Plaintiff's Mem. at 21–22. The Court does not view the two situations as comparable. *See Phillips v. Holladay Prop. Servs., Inc.,* 937 F.Supp. 32, 37 (D.D.C.1996)(stating that white employee who showed up late for work without being disciplined was not similarly situated to black colleague who was fired for insubordination); *see also Silvera v. Orange County Sch. Bd.,* 244 F.3d 1253, 1259 (2001)("the comparator's misconduct must be nearly identical to the plaintiff's in order 'to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.'")(quoting *Maniccia v. Brown,* 171 F.3d 1364, 1368–69 (11th Cir.1999)). In addition, as Gibson herself noted, the reports of McCollum's lateness were "hearsay," Gibson Dep. at 174, and "[n]o one could ever prove it," *id.* In contrast, Gibson personally witnessed and directly experienced Plaintiff's insubordinate and disrespectful behavior in refusing to stock in chill.

### b. Mike Texeira

Plaintiff notes that Mike Texeira, a white employee, who reported to Gibson, *see* Gibson Dep. at 106, 109, 111, punched another employee in the face and "only received a suspension for a week," Plaintiff's Mem. at 25. However, as Gibson testified, this incident occurred on her day off, *see* Gibson Dep. at 111, and the matter was handled by Blythe, *see id.* at 111–12. Thus, this incident fails to advance Plaintiff's contention that Gibson did not punish white employees as harshly as she punished Plaintiff.

Plaintiff points to testimony by Furtado that he witnessed a disagreement between Texeira and Gibson during which voices were raised. *See* Plaintiff's Mem. at 25;

> . . .
> Q. Are you telling me that he always did what you told him to do?
> . . .

> A. From what I can recall, yes.
> Q. Is it possible he did not?
> A. There could be a possibility he did not.
> Gibson Dep. at 222–23.

*see also* Furtado Dep. at 94. Plaintiff argues that "[s]ignificantly, unlike she did with Sellers, Gibson never complained to Furtado about Texeira." [75] Plaintiff's Mem. at 25 (citing Furtado Dep. at 100). However, this incident cannot be said to be comparable to Plaintiff's refusal to go to chill. Furtado testified that "I'm not sure what was said, but voices were raised. Then Mary went her way, and Mike went his way." Furtado Dep. at 94. This evidence falls far short of showing that Texeira refused to comply with a directive from Gibson and that he was disrespectful in the process.

Plaintiff argues that Texeira refused to follow Gibson's orders about twice a week for four months but that Gibson did not discipline him. *See* Plaintiff's Mem. at 25–26. However, as Gibson explained, what was occurring was that she would tell Texeira to do something and "[h]e would say okay and tell me he was going to do it, however, as soon as Mr. Furtado came in at 9 o'clock he would go to Mr. Furtado and Mr. Furtado would find someone else to do it." Gibson Dep. at 118. Gibson went to Furtado and complained that he was overriding her and making it impossible for her to reprimand Texeira for failing to follow her instructions.[76] *Id.* at 117. After this meeting, Gibson never had any problem with Texeira. *See id.* Again, in contrast to Plaintiff's actions, Texeira's cir-

cumvention of Gibson's authority did not involve either defiance of a directive or openly disrespectful conduct.

### c. Ryan Diego

Plaintiff cites an incident in which another white employee supervised by Gibson, Ryan Diego, put a computerized drawing of a penis on Gibson's computer. *See* Plaintiff's Mem. at 26. Because Sellers was working on the CAO computer which was nearby, Gibson asked Plaintiff to give a written statement. *See* Gibson Dep. at 126–27. Plaintiff refused.[77] *See id.* at 127–28. This incident was among grounds cited for Plaintiff's termination. *See id.* at 132–33. Plaintiff refers to instances where other employees allegedly refused to give statements, but were not disciplined. *See* Plaintiff's Mem. at 27–28. However, Plaintiff's termination is not part of this case, and the comparison which Plaintiff attempts to draw is not "apples … to apples," *Dartmouth Review v. Dartmouth Coll.*, 889 F.2d at 19, given the scope of this action. To the extent that a comparison can be drawn between Diego's misconduct and Plaintiff's insubordination, a proposition which is itself dubious, *see Childs–Pierce v. Util. Workers Union of Am.*, 383 F.Supp.2d at 70 (noting that "[t]he nature of the offenses committed and the nature of the punishments imposed are the most significant variables in a case alleging discrimination in connection

**75.** Plaintiff's assertion that "Gibson never complained to Furtado about Texeira," Plaintiff's Mem. at 25, ignores Gibson's testimony that she spoke with Furtado regarding Texeira, *see* Gibson Dep. at 117. To the extent that Plaintiff may rely on the fact that Furtado did not recall such a conversation, *see* Furtado Dep. at 101, Plaintiff should have at least acknowledged Gibson's contrary testimony. This is especially true in light of the representation which Plaintiff's counsel made to Furtado at his deposition: "I'm going to represent to you that Mary Gibson said that after this had been going on for some time she

went to you and spoke to you about this issue." *Id.*

**76.** Plaintiff asserts that Furtado denied being approached by Gibson about overriding her instructions to Texeira. *See* Plaintiff's Mem. at 26 n. 29. However, while Furtado did not recall the conversation, he declined to testify that it did not occur. *See* Furtado Dep. at 101.

**77.** Gibson testified that Plaintiff ultimately gave a statement which said "I have nothing to say." Gibson Dep. at 131.

with disciplinary actions"), the significant fact is that Diego, like Plaintiff, was given a letter of reprimand for his misconduct, *see* Gibson Dep. at 124–25.

#### d. Richard Walsh

Plaintiff refers to another employee, Richard Walsh, who she alleges was instructed by Gibson to write a statement about an incident between Gibson and Plaintiff and that Walsh refused. *See* Plaintiff's Mem. at 28. Plaintiff's citation to the record regarding Walsh is so sketchy that the Court declines to consider this portion of Plaintiff's argument. *Cf. Andrews v. Am. Red Cross Blood Servs., New England Region,* 251 F.Supp.2d 976, 982 (D.Me.2003)("It is not the court's burden to sift through the summary judgment record and compare the co-worker's alleged conduct to the defendant's policy to determine whether this is in fact the case [i.e., that the co-worker is similarly situated in all relevant respects]."); *see also Booker v. Mass. Dep't of Pub. Health,* 527 F.Supp.2d 216, 227 (D.Mass.2007)("A plaintiff does not carry her burden of demonstrating pretext on a motion for summary judgment where she provides merely sketchy evidence lacking a sufficient foundation for a legally relevant comparison of allegedly similarly situated employees.")(internal quotation marks omitted). Even if the Court were to overlook this deficiency, the conduct involved, an alleged refusal to provide a written statement, is dissimilar to the conduct for which Plaintiff received the letter of reprimand. As the Court has already noted, while Plaintiff's refusal to provide a written statement may have been among the grounds for her termination, that termination is not part of this case.

#### e. Charles Cloud and Thelma Edens

Plaintiff directs the Court to Plaintiff's Ex. 9, which consists of twenty pages and includes several different documents, and asserts that many of Cloud's "problems were similar to those experienced by Sellers." Plaintiff's Mem. at 29. Plaintiff provides no explanation as to how Cloud's problems were similar to Plaintiff's other than referring the Court to Cloud's ten page affidavit, one of the documents contained within Plaintiff's Ex. 9. This argument and citation are inadequate. The Court is not required to undertake the task of sifting through the summary judgment record in search of evidence to satisfy Plaintiff's burden. *See Andrews v. Am. Red Cross Blood Servs., New England Region,* 251 F.Supp.2d at 982 ("it is the plaintiff's burden to identify the factual basis in the summary judgment for this contention [i.e., that Plaintiff was treated differently from persons similarly situated in all relevant respects]").

With respect to Thelma Edens, it does not appear that any of the incidents to which Plaintiff refers involved Gibson. *See* Plaintiff's Mem. at 29–30. Moreover, Plaintiff's citation to the record is again sketchy. For example, Plaintiff invites the Court to "See Plaintiff's Exhibit 10," *id.* at 30, without any guidance as to where in the forty plus pages which comprise this exhibit evidence supporting Plaintiff's statement can be found. Plaintiff appears to quote from a letter written by Edens, but provides no citation for the quote. *See id.* To the extent such letter is buried within Plaintiff's Ex. 10, the Court declines to sift through more than two score documents in search of it.

### 2. Pretext Analysis Re Specific Claims

#### a. Denial of Annual Leave Requests

Defendants have offered evidence that the three requests for leave which Plaintiff submitted in July were denied because she had not submitted a leave planner as required by the MLA, *see* Defendants' App., Ex. 15 at 30; *id.,* Ex. 1b at D–0189, and as

directed by both Furtado, *see id.*, Ex. 4 (Furtado Decl.) ¶ 6, and Blythe, *see* SUF ¶ 26. Plaintiff admits that she did not submit the planner. *See* Defendants' App., Ex. 14 (Sellers' Decl. of 12/10/04) at D–0105. Defendants have also offered evidence that Plaintiff's request for leave in November was denied because other employees were on leave. In particular, the record shows that McCollum was either off or had approved annual leave scheduled on at least one of the days in each of the two groupings of dates for which Plaintiff was requesting annual leave. *See* Defendants' App., Ex. 1 (DeSantis Decl.) ¶ 5.

For essentially the same reasons that the Court previously concluded that Plaintiff is unable to establish an inference of racial discrimination with respect to the denial of her leave requests, *see* Part VII. C.1.a. *supra* at 92–94, Plaintiff's attempt to show that Defendants' reasons for such denial are pretextual fails. Without repeating that entire discussion here, the Court again notes that Plaintiff is mistaken in her belief that none of her leave requests for annual leave were approved.[78] *See* Sellers Dep. at 32, 209; SUF ¶¶ 37–38.

**b. Denial of Restoration of Leave**

Defendants denied Plaintiff's request for restoration of annual leave because she did not meet all four criteria to have her leave restored. *See* Blythe Dep. at 272–73; *see also* SUF ¶ 79.[79] Plaintiff offers no evidence that meeting all four criteria was not, in fact, a requirement to have a request for restoration of annual leave granted. Instead, Plaintiff cites the fact that when Furtado was deposed on July 31, 2007, he testified that he did not realize until the day prior to his deposition, when the request form was shown to him by Defendants' counsel, that he was mistaken in approving Plaintiff's request for restoration of leave. *See* Furtado Dep. at 122–23. Plaintiff points out that Furtado stated in his December 1, 2004, declaration that he was aware by that date that Plaintiff "did not meet the criteria to have her annual leave restored." Defendants' App., Ex. 5 (Furtado Decl.) at D–0154. However, this conflict as to when Furtado became aware that it was necessary for Plaintiff to meet all four criteria does not contradict the basic fact that all four of the criteria had to be met and Plaintiff did not meet them. The Court is also unpersuaded by this conflict that the reason offered by Defendants for the denial was a sham and that discriminatory animus was the actual reason. *See Conward v. Cambridge Sch. Comm.*, 171 F.3d at 19 (stating that in order for plaintiff to meet his burden at this step of the *McDonnell Douglas* burden shifting framework he must show that defendant's proffered reason is a sham and that discriminatory animus sparked defendant's actions).

In short, I find that with respect to the denial of her request for restoration of annual leave Plaintiff has failed to meet her burden in showing pretext. Defen-

---

**78.** At her deposition, Plaintiff was asked:

Q. So, you thought it was okay not to follow Mr. Blythe's instructions regarding submitting an annual leave planner?

. . . .

A. I didn't feel that it was okay. I felt that I was going to be able to take my leave, take whatever was left. I had no idea that he was going to end up denying all of my leave.

Sellers Dep. at 31–32.

**79.** Plaintiff denies SUF ¶ 79 and cites "Defendants' Ex. 1b," PSDF ¶ 79, to support her denial. However, Defendants' Ex. 1b consists of more than fifty pages and several different documents. Plaintiff provides no page or paragraph number to assist the Court in locating the evidence Plaintiff contends disputes this fact. Thus, she has failed to comply with LR Cv 56(a)(3), and the Court finds SUF ¶ 79 to be undisputed.

dants are entitled to summary judgment as to this claim with respect to Count I, and I so recommend.

### c. Letter of Reprimand

The Letter of Reprimand states that it was issued because of Plaintiff's "failure to follow instructions and disrespectful conduct." Defendants' App., Ex. 1b at D–0194. In determining whether Plaintiff is able to show that these were not the true reasons for the issuance of the letter, the Court bears in mind that "the pretext inquiry is concerned with the employer's *perception* of the employee's performance, not the employee's own beliefs." *Hankins v. Airtran Airways, Inc.,* 237 Fed.Appx. 513, 522 (11th Cir.2007) (unpublished opinion).

Here Gibson believed that Plaintiff was able to stock items in chill because there was no medical documentation in Plaintiff's personnel file that showed Plaintiff had any medical restrictions on that date. *See* SUF ¶ 66;[80] *see also* Gibson Dep. at 74–75; Defendants' App., Ex. 1b at D–0118, D–0195; Defendants' App., Ex. 20 (Gibson Decl. of 11/30/07) ¶ 8. Gibson's honest belief that this was the case is supported by the fact that at the time she asked Plaintiff to stock, Plaintiff was already stocking in the HBA aisle. *See* SUF ¶ 54; *see also* Defendants' App., Ex. 20 ¶ 3. In addition, Plaintiff never provided Gibson with any documentation after the fact which showed that she actually had a medical restriction on December 5, 2003.[81] *See id.* ¶ 8. Moreover, even if Plaintiff had some physical disability which was not documented, Gibson offered to assist Plaintiff so that she would not have to lift any cases in chill. *See* Defendants' App., Ex. 18 at D–0146; Gibson Dep. at 74–75. When Plaintiff still refused to comply with Gibson's direction, Gibson went to chill and performed the task herself. *See* Defendants' App., Ex. 20 ¶ 4.

It is undisputed that there was at least one jacket available for Plaintiff to wear in chill. Plaintiff's complaint that the jacket was "dirty" falls short of establishing pretext when other DeCA employees and contract employees used the jacket(s) when going into the chill area. *See* Sellers Dep. at 148; Defendants' App., Ex. 3 (Blythe Decl.) ¶ 7, Ex. 20 (Gibson Decl.) ¶ 6, Ex. 4 (Furtado Decl.) ¶ 8, Ex. 9 (Bucolo Decl.) ¶ 5, Ex. 32 (McCollum Decl.) ¶ 3. The other employees who used the jacket(s) included white employees such as Blythe, Gibson, Bucolo, McCollum, and Fields. *See* Defendants' App., Ex. 3 (Blythe Decl.) ¶ 7, Ex. 20 (Gibson Decl.) ¶ 6, Ex. 4 (Furtado Decl.) ¶ 8, Ex. 9 (Bucolo Decl.) ¶ 5, Ex. 32 (McCollum Decl.) ¶ 3.

Plaintiff does not deny that she refused to comply with Gibson's directive to go to chill to stock. *See* Sellers Dep. at 48. Indeed, in a written response to the Letter of Reprimand, Plaintiff defiantly wrote: "It states in the letter what kind of corrective action I'm going to take, NONE!" Defendants' App., Ex. 23 at D–0047. Plaintiff argues that white employees engaged in conduct which was much worse than hers but did not receive a Letter of Reprimand or equivalent discipline. *See* Plaintiff's Mem. at 19–30. However, the Court has already found Plaintiff's comparative evidence wanting for the reasons discussed in Part VII.E.1. *supra* at 97–101.

### d. Promotion and Change in Schedule

Defendants state that Plaintiff was not promoted from GS–5 to GS–7 level be-

---

**80.** *See* n. 25.

**81.** Defendants note that the Workers' Compensation Hearing transcript shows that Plaintiff's claim of prior injury was to her left wrist and that Plaintiff was right-handed. Defendants' App., Ex. 22 (Transcript of Proceedings) at D–0681 to D–0682.

cause she failed to complete the training requirements for the CAO position. *See* Defendants' App., Ex. 24 (Blythe Decl. of 2/16/05) at D–0141. Defendants explain the change in Plaintiff's schedule in December of 2004 as being made so that Plaintiff would learn the afternoon functions of the CAO position. *See id.* at D–0139. Relatedly, Defendants note that both McCollum and Bucolo, who also held CAO positions, had their hours changed numerous times. *See id.,* Ex. 9 ¶ 4, Ex. 32 ¶ 2.

Plaintiff argues that these reasons are pretextual. She asserts that she had completed all of her training for the CAO position and cites McCollum's deposition testimony as supporting this assertion. *See* Plaintiff's Mem. at 33 (citing McCollum Dep. I at 111). The cited testimony hardly supports Plaintiff's contention that she successfully completed all her training for the CAO position.

Q. So you're saying that you trained Rose for the [CAO] job?

A. Right.

Q. So how long did that training take place?

A. It seemed like it took forever because she was always asking, repeating the questions on how to do something in CAO.

Q. But can you give me a time frame, how long it took?

A. I was always—she was always asking questions. As long as she had

the job she always did not seem to understand what to do.

McCollum Dep. I at 111–12.

Moreover, McCollum was a co-worker and not a supervisor. Furthermore, he did not testify that the training he provided was the only training which Plaintiff was required to undergo or that training alone, regardless of performance, guaranteed a promotion to GS–7.

Plaintiff argues that the change in her schedule was pretext. *See* Plaintiff's Mem. at 37. She again asserts that she had completed her training, but the Court has already found this assertion to be unsupported for the reasons stated above.[82] Plaintiff further argues that "the letter indicating the change does not reflect that her hours are being changed for training purposes," Plaintiff's Mem. at 37, but she does not provide any citation as to where this document can be found in the record, *see id.*

Plaintiff cites testimony from Bucolo that up until a recent change she has always worked the first shift as CAO, *see* Bucolo Dep. at 42, and that prior to this shift change there were no CAO duties that had to be performed during the second or third shift, *see id.* at 43. As further support, Plaintiff cites McCollum's testimony that CAO tasks could be performed anytime.[83] *See* McCollum Dep. I at 75. However, Bucolo and McCollum are both low level employees who testified based on their personal experiences. The Court does not find their testimony sufficient to contradict Defendants' strong documentary and testimonial evidence that there

---

**82.** Plaintiff also offers no citation for her implicit contention that she had completed her training prior to the change in her schedule. *See* Plaintiff's Mem. at 37.

**83.** It bears noting that McCollum did not testify that there were no CAO tasks that had to be performed at certain times of the day. *See*

McCollum Dep. I at 75. Rather, at the end of a multi-sentence answer he added "But you could do [CAO] any time." *Id.* The fact that there may have been some CAO tasks which *could be performed "any time"* does not mean that all CAO tasks could be performed at any time.

were afternoon CAO tasks which had to be performed and that Plaintiff's schedule was changed so that Bythe would know whether Plaintiff could perform these tasks, *see* Defendants' App., Ex. 1b at D–0181, Ex. 1d at 32, Ex. 3a at D0412, Ex. 25. In particular, the Training Plan for Computer Assisted Order ("Training Plan") specifically supports changing Plaintiff's schedule to cover afternoon functions, particularly when a store has two CAOs.[84] *See id.,* Ex. 1d at 32. The Training Plan also includes a "model" task list that identifies CAO processing that will occur throughout the day, including during the afternoon hours. *See id.,* Ex. 1d at 33–38. In addition, the job description for the CAO position states that CAOs "[m]ay work uncommon tours of duty as required to meet demands of effective mission accomplishment." *Id.,* Ex. 1b at D0181. Moreover, Blythe's sworn declaration that he changed Plaintiff's schedule because he needed to know whether she could perform the afternoon functions of her job before he could promote her, *see id.,* Ex. 3 ¶ 6, is supported by his contemporaneously created December 13, 2004, email to Zone Manager Cook.

Plaintiff argues that her job performance belies Defendants' position that she needed additional training. *See* Plaintiff's Mem. at 34. She asserts that "Mr. Cloud—with whom she worked in dairy and who knew the CAO job—said Sellers knew all the CAO functions." *Id.* As previously noted, Plaintiff provides no citation as to where this statement by Cloud can be found. After reading Cloud's ten page affidavit, the Court assumes Plaintiff is relying upon paragraph 48 wherein Cloud states: "I knew how to do the CAO sys-

tem. It was an easy system. Based on my experience working with Rose Sellers, she knew how to do the CAO job." Plaintiff's Ex. 9 (Cloud Aff.) ¶ 48. Other than the vague reference to his "experience working with Rose Sellers," *id.,* Cloud's affidavit does not explain the degree to which he was able to observe and evaluate Plaintiff's CAO performance or his qualifications to make a determination that she knew how to do the job. Plaintiff has provided no evidence that Cloud in any way supervised or evaluated Plaintiff or that he had some expertise in CAO functions. His affidavit is, therefore, insufficient to overcome Defendants' evidence that Plaintiff was not promoted because she did not complete her CAO training and that her schedule was changed for the purpose of enabling her to learn the afternoon functions. *See* Fed.R.Civ.P. 56(e)(1) ("A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated.").

Plaintiff also contends that Furtado's deposition testimony belies Defendants' claim that she needed additional training. *See* Plaintiff's Mem. at 34. While Furtado testified that on a scale of one to five, with one being the best and five being the worst, he would have rated Plaintiff's CAO skills as "probably about a two," Furtado Dep. at 126, he also noted that "[s]he was in the learning mode. She had a lot to learn," *id.* Furtado further testified that he believed that Plaintiff was not motivated "[a]t times," *id.* at 136, and that "her performance started going downhill," *id.* at 137. Furtado did not testify that Plaintiff successfully completed her CAO training.

**84.** The Training Plan states in relevant part: "Stores that have two CAOS assigned should provide overlap coverage using a work schedule for these general time frames (0600 hours through 1500 hours or 1000 hours through 1900 hours)." Defendants' App., Ex. 1d at 32.

Plaintiff also asserts that Gibson "confirms that Sellers was more than proficient in her CAO job." Plaintiff's Mem. at 34 (citing Gibson Dep. at 50–52). Putting it mildly, this overstates Gibson's testimony. Gibson testified that she did not believe Plaintiff understood the CAO job. *See* Gibson Dep. at 50. While she was reluctant to draw comparisons between employees, *see id.* at 47–52, Gibson stated that she was "sure," *id.* at 51, that Plaintiff did not perform the way McCollum did, *see id.* at 50–51.

In short, the evidence Plaintiff cites to show that the explanations offered by Defendants for not promoting her to GS–7 and changing her schedule are pretextual is unpersuasive. Defendants are entitled to have their motion for summary judgment granted as to this and all other claims on which Plaintiff bases her claim of disparate treatment. I so recommend.

## VIII. Count II—Hostile Work Environment

### A. Law

"Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating 'against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Torres–Negrón v. Merck & Co.*, 488 F.3d 34, 39 (1st Cir.2007)(quoting 42 U.S.C. § 2000e–2(a)(1)) (alteration in original). "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367,

126 L.Ed.2d 295 (1993) (citations and internal quotation marks omitted).

To succeed in her hostile workplace environment claim, Plaintiff must show: (1) that she is a member of a protected class; (2) that she was subjected to unwelcome harassment; (3) that the harassment was based on her membership in the protected class; (4) that the harassment was so severe or pervasive that it altered the conditions of her employment and created an abusive work environment; (5) that the objectionable conduct was objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established. *Torres–Negrón v. Merck & Co.*, 488 F.3d at 39 (citing *O'Rourke v. City of Providence*, 235 F.3d 713, 728 (1st Cir.2001)(citing *Faragher v. City of Boca Ratón*, 524 U.S. 775, 787–89, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998))). In determining whether an environment is sufficiently hostile or abusive to be actionable, courts must look at all the circumstances, including the "'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270–71, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001)(quoting *Faragher v. City of Boca Ratón*, 524 U.S. at 787–78, 118 S.Ct. 2275).

### B. Application

Plaintiff asserts that she was subjected to pervasive harassment based on her race, but most of the examples which she cites lack any citation to the record.[85]

---

85. Plaintiff states in a footnote that she "incorporates by reference the facts in support of

her disparate treatment claims." Plaintiff's Mem. at 38 n. 48. The location in the memo-

*See* Plaintiff's Mem. at 38–39. The Court therefore does not consider them. In one instance, she alleges that "Furtado issued her a letter in which he instructed her—hour by hour—how she had to spend her day," *id.* at 38, and cites "Plaintiff's Exhibit 18," *id.* However, the Court has already noted that Plaintiff's Ex. 18 consists of fifty-five pages, and the Court should not have to search for the supporting material. *See* Part II.F. *supra* at 79 n. 33.

The few examples which Plaintiff cites that have adequate citation are not persuasive. Plaintiff alleges that Furtado significantly increased her duties and responsibilities at a time when he claimed her job performance was deficient. *See* Plaintiff's Mem. at 38 (citing Furtado Dep. at 233–36). To the extent Plaintiff contends that the increase in duties and responsibilities is evidence of harassment, Plaintiff's argument is unpersuasive. Furtado testified that at the time of the increase Plaintiff

"only had a small portion of the store ...," Furtado Dep. at 233, and he wanted to make the distribution of work "fair to both CAOs," *id.*

Plaintiff claims that "[h]er supervisors allude to the fact that she acted like a gorilla when they describe her banging on her chest during meetings...." Plaintiff's Mem. at 39 (citing Furtado Dep. at 167). This mischaracterizes Furtado's testimony. He never stated that Plaintiff acted "like a gorilla." Rather, he testified that Plaintiff had "banged her chest" during a meeting [86] and at other times. Furtado Dep. at 167.

Plaintiff asserts that "[s]he was excluded from meetings that even Bucolo was allowed to attend." Plaintiff's Mem. at 39 (citing Furtado Dep. at 227). The cited reference reflects that Furtado showed McCollum and Bucolo how to do something which apparently pertained to CAO duties. *See* Furtado Dep. at 227. Furtado testified that Plaintiff felt slighted and

---

randum of the "facts" to which she refers is not stated, and it appears that "facts" are sprinkled throughout the thirty-six pages of the memorandum which pertain to that claim in some respect. *See* Plaintiff's Mem. at 1–36. The Court declines to search through these pages and guess which facts Plaintiff contends support her hostile work environment claim. *Cf. Ríos–Jiménez v. Principi*, 520 F.3d 31, 39 (1st Cir.2008)(noting that if "blatant noncompliance" with local rule were excused, "the district court would be forced to grope unaided for factual needles in a documentary haystack")(internal quotation marks omitted); *Mercado–Alicea v. P.R. Tourism Co.*, 396 F.3d 46, 51 (1st Cir.2005)("District courts are not required to ferret through sloppy records in search of evidence supporting a party's case."). Moreover, as has already been noted, Plaintiff's citation to the record in support of her disparate treatment claim leaves much to be desired. *See, e.g.*, Plaintiff's Mem. at 7–8 (citing the sixty-five plus pages of Plaintiff's Ex. 2), 21 (failing to provide any citations for entire first paragraph).

**86.** Furtado testified that the meeting had been called by him in an attempt to resolve the

problem between Plaintiff and Gibson. *See* Furtado Dep. at 152.

Q. The whole idea was to try to get it resolved, right?

A. Yes, I always try to resolve it. When you have a person coming in here and beating on their chest and slapping their hand on the table, she's becoming intimidating. She's becoming, you're kind of like, you're creating—I don't know. You're creating an atmosphere where nothing can get accomplished.

Q. So when you say she was beating her chest, was she hitting her chest?

A. Yes, ma'am.

Q. So would you agree with me that there is a difference between beating your chest and hitting your chest, right?

MS. NGUYEN: Objection. A. Same thing.

Q. In your mind, it's the same. Was she touching her chest, or was she beating it?

A. She was beating it.

Q. Define for me what she was doing.

A. Beating, she was having her hand, slamming it on her chest.

Furtado Dep. at 152–53.

that as a result he "sat down with her, and I showed her how to back stuff off the record, how to adjust cycle counts." *Id.* Being excluded from a single meeting provides little support for Plaintiff's hostile work environment claim. *Cf. Whittaker v. N. Illinois Univ.,* 424 F.3d 640, 645 (7th Cir.2005)("Indeed, the threshold for plaintiffs is high, as '[t]he workplace that is actionable is one that is "hellish." ' "); *Ford–Fugate v. FedEx Freight,* No. 1:04–cv–1514–RLY–TAB, 2007 WL 79104, at *5 (S.D.Ind. Jan. 8, 2007)("Plaintiff's allegations that she was excessively monitored, excessively paged at work, given more difficult assignments than her male co-workers, and disciplined more than her male co-workers, do not amount to a working environment that could be characterized as 'hellish.' ")(quoting *Whittaker* ).

Plaintiff also contends that the denial of her requests for annual leave and restoration of annual leave "are ... part of her hostile work environment claim." Plaintiff's Mem. at 14 n. 14. The Court has already determined that the denial of requests to take leave on particular dates is not an adverse employment action. For the same reasons, such denial cannot be said to alter the conditions of Plaintiff's employment and create an abusive work environment. *See Torres–Negrón v. Merck & Co.,* 488 F.3d at 39. The denial also is not objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive. *See id.* Similarly, with respect to the denial of Plaintiff's request for restoration of leave, Plaintiff cannot show that the objectionable conduct was objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive, because Plaintiff failed to satisfy all four requirements for the request to be granted.

In short, I find that Defendants' Motion for Summary Judgment with respect to Count II should be granted. Even if the Court were to assume that Plaintiff was subjected to unwelcome harassment, she has not shown that the harassment was based on her race; that the harassment was so severe and pervasive that it altered the conditions of her employment and created an abusive work environment; that the objectionable conduct was objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim did perceive it to be so; and that some basis for employer liability has been established. *See Torres–Negrón v. Merck & Co.,* 488 F.3d at 39.

## IX. Count III—Retaliation

### A. Law

■ To sustain a claim of retaliation, a plaintiff must produce evidence on three points: 1) that she engaged in protected conduct under Title VII; 2) that she experienced an adverse employment action; and 3) that a causal connection exists between the protected conduct and the adverse action. *Gu v. Boston Police Dep't,* 312 F.3d 6, 13–14 (1st Cir.2002). "An employee has engaged in an activity protected by Title VII if she has either opposed any practice made unlawful by Title VII, 'or made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].' " *Torres–Negrón v. Merck & Co.,* 488 F.3d at 44 (quoting 42 U.S.C. § 2000e–3 (a)) (alteration in original).

To establish an adverse employment action a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, meaning that "it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.' " *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)(quoting *Rochon v. Gonzales,* 438

F.3d 1211, 1219 (D.C.Cir.2006)). As the Supreme Court has observed, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.*

■ An employee claiming retaliation is required to produce evidence of a causal link between his complaint of discrimination and an adverse employment action. *Holloway v. Thompson Island Outward Bound Educ. Ctr., Inc.*, 492 F.Supp.2d 20, 26 (D.Mass.2007).

> There are sound reasons for the requirement that an employee claiming retaliation produce evidence of a causal link between his complaint of discrimination and an adverse employment action. If filing a complaint about discriminatory behavior were to give an employee complete protection from workplace discipline, then any employee who had engaged in misconduct "could effectively inhibit a well-deserved discharge by merely filing, or threatening to file, a discrimination complaint."

*Holloway v. Thompson Island Outward Bound Educ. Ctr., Inc.*, 492 F.Supp.2d at 26; *see also Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 828–29 (1st Cir.1991) (agreeing that statutes barring retaliation for exercising rights guaranteed by law do "not clothe the complainant with immunity for past and present inadequacies, unsatisfactory performance, and uncivil conduct in dealing with subordinates and with his peers")(internal quotation marks omitted).

## B. Application

Plaintiff filed her second EEO complaint on April 14, 2004. SUF ¶ 103. The retaliation claim contained in that complaint, as later defined, is that Blythe retaliated against Plaintiff for her May 7, 2001, EEO Complaint by denying her annual leave requests and her request for restoration of annual leave and that Gibson retaliated against her for the same reason by issuing the letter of reprimand. *See* SUF ¶ 104. Plaintiff additionally argues that her failure to be promoted and her fourteen day suspension are acts of retaliation which are "reasonably related to and grow[ ] out of the discrimination complained of to the agency . . .," *Clockedile v. New Hampshire Dep't of Corr.*, 245 F.3d at 6, and may be considered even though they were not mentioned in her EEO complaint, *see* Plaintiff's Mem. at 8–9, 11 n. 11. Counsel for Defendants conceded at the hearing that the failure to promote could be considered part of Plaintiff's retaliation claim based on the holding in *Clockedile.*

### 1. Adverse Employment Action

To the extent that Plaintiff relies upon the denial of her request to take annual leave on particular dates in 2003 and the change in her schedule for four weeks to support her claim of retaliation, such claim fails because the denial and the change in schedule do not rise above the level of minor annoyances.

### 2. Causal Connection

#### a. Temporal Proximity

■ As shown below, three of the actions on which Plaintiff bases her claim of retaliation occurred long after the filing of her EEO complaint in May of 2001 and cannot reasonably be attributed to retaliation:

> Denial of annual leave in July 2003—25 months;
>
> Letter of Reprimand in February 2004—33 months;
>
> Denial of restoration of leave in March 2004—34 months.[87]

---

87. Plaintiff submitted her request for restoration of leave on March 4, 2004. SUF ¶ 78.

*See Clark County Sch. Dist. v. Breeden,* 532 U.S. at 274, 121 S.Ct. 1508 ("Action taken ... 20 months later suggests, by itself, no causality at all."); *see also Morón–Barradas v. Dep't of Educ. of Puerto Rico,* 488 F.3d 472, 481 (1st Cir.2007) (finding no evidence of a causal connection where adverse action occurred fifteen months after EEOC charge was filed); *Ramírez Rodríguez v. Boehringer Ingelheim Pharms., Inc.,* 425 F.3d 67, 85–86 (1st Cir.2005)(finding two month temporal proximity between filing of discrimination complaint and plaintiff's termination insufficient to establish a causal connection); *Calero–Cerezo v. U.S. Dep't of Justice,* 355 F.3d 6, 25 (1st Cir.2004) ("Three and four month periods have been held insufficient to establish a causal connection based on temporal proximity.").

Even the remaining actions upon which Plaintiff relies lack sufficient temporal proximity to the filing of her second EEO complaint on April 14, 2004, to permit a reasonable jury to infer that Defendants retaliated against her for engaging in protected EEO activity.

Failure to Promote—six months; [88]

Fourteen Day Suspension—twelve months.

In reaching this conclusion, the Court relies upon the same case law cited above.

### b. Gibson's Lack of Knowledge

■ Gibson, who had become grocery manager in August 2003, was unaware of Plaintiff's EEO activity at the time she issued the Letter of Reprimand to Plaintiff in February 2004. *See* Defendants' App.,

Ex. 20 ¶ 7. Thus, for this additional reason Plaintiff cannot show a causal connection between her filing of the EEO complaint in 2001 and the issuance of the Letter of Reprimand in 2004. *See Sanchez v. Denver Pub. Schs.,* 164 F.3d 527, 534 (10th Cir.1998)(holding that plaintiff failed to establish a prima facie case of retaliation where there was no evidence that decision maker knew of plaintiff's filing of discrimination claim); *Kosereis v. Rhode Island,* 331 F.3d 207, 217 (1st Cir.2003)("It is insufficient for [plaintiff] to simply recount that he complained and that he was disciplined ....") (second alteration in original).

## X. Summary

### A. Count I—Disparate Treatment

To the extent that Plaintiff's disparate treatment claim is based on the July 14, 2003, denial of her requests for leave in August 2003 and the denial of promotions and pay, such claim is barred because she failed to exhaust her administrative remedies. To the extent that Plaintiff's claim is based on her fourteen-day suspension, such claim is barred for failure to exhaust administrative remedies because: a) Plaintiff elected to pursue the grievance through the process established by the MLA and then failed to complete that process, and b) even if Plaintiff's failure to complete the process was due to the union's unwillingness to take the matter to arbitration, Plaintiff never claimed in her grievance that her suspension was based

---

The exact date the request was denied by Blythe is unclear, but it was the same day or shortly thereafter. *See* Blythe Dep. at 272.

**88.** In using the period of six months, the Court gives Plaintiff the benefit of all favorable inferences. Plaintiff completed the "DeCA East CAO Training 2004," Plaintiff's

Ex. 14, on October 15, 2004. Thus, even assuming no further on the job training was necessary, October 15, 2004, would be the earliest possible date that Plaintiff completed her training and was eligible for promotion to GS–7.

on racial discrimination or retaliation for filing an EEO complaint.[89]

Even if the Court were to overlook these failures to exhaust her administrative remedies, Plaintiff is unable to establish a prima facie case with respect to her disparate treatment claim to the extent such claim is based on the denial of her requests for annual leave and restoration of leave and the change in her work schedule. To the extent that Plaintiff's disparate treatment claim is based on the letter of reprimand, the Court assumes that Plaintiff has shown a prima facie case of discrimination. However, this ground for the claim is barred because Plaintiff is unable to show that Gibson's reason for issuing the letter of reprimand is a pretext for racial discrimination. Similarly, even if Plaintiff were able to establish a prima facie case of disparate treatment with respect to: a) the denial of her requests for annual leave; b) the denial of her request for restoration of leave; c) the failure to promote her, and d) the change in her schedule, Plaintiff is unable to show that Defendants' explanations for these actions are pretextual and that the actual reason was racial discrimination.

## B. Count II—Hostile Work Environment

Plaintiff cannot succeed on her hostile work environment claim because, even if the Court assumes she was subjected to unwelcome harassment, she cannot show that the harassment was based on her race; that the harassment was so severe and pervasive that it altered the conditions of her employment and created an abusive work environment; that the objectionable conduct was objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and Plaintiff perceived it to be so; and that some basis for Defendants' liability has been established. *See Torres–Negrón v. Merck & Co.*, 488 F.3d at 39.

## C. Count III—Retaliation

Plaintiff's retaliation claim fails because, to the extent she relies upon the denial of her requests for leave and the change in her schedule, such actions do not constitute adverse employment actions. Plaintiff is additionally unable to show a causal connection between her protected activity and any action which she contends is an adverse employment action. All of the actions which she cites are not sufficiently near in time to the protected activity to allow an inference of retaliation to be drawn. In addition, with respect to the Letter of Reprimand, there no evidence that Gibson was aware of Plaintiff's protected activity. *See Randlett v. Shalala*, 118 F.3d 857, 862 (1st Cir.1997)("To make out a retaliation claim requires not only an adverse employment action and previously protected conduct, but also a colorable showing that a causal connection existed between the protected conduct and the adverse action.")(internal quotation marks omitted.)

## XI. Conclusion

For the reasons explained above, the Court recommends that Defendants' Motion for Summary Judgment be granted and that the action be dismissed. Any objections to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt.[90] *See* Fed.R.Civ.P.

---

89. To the extent Plaintiff contends that this suspension is part of her hostile work environment and retaliation claims, it is barred for the same reasons.

90. The ten days do not include intermediate Saturdays, Sundays, and legal holidays. *See* Fed.R.Civ.P. 6(a).

72(b); DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision. *See United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603, 605 (1st Cir.1980).

Jan. 23, 2009.